372 A.2d 749

**Appeal of Albert L. NICCOLI.**

Supreme Court of Pennsylvania.

Argued Sept. 21, 1976.

Decided April 28, 1977.

Michael L. Rosenfield, Berlin, Boas, Isaacson, Logan, Rosenfield & Sharon, Pittsburgh, for appellant.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY and MANDERINO, JJ.

## OPINION OF THE COURT

EAGEN, Chief Justice.

On October 16, 1975, appellant Albert L. Niccoli, who was then 54 years of age, divorced, and living with his 86-year-old father and next door to his 56-year-old brother, appellee Emil V. Niccoli, voluntarily signed himself into the Leech Farm Veterans Administration Hospital [Leech Farm] as a psychiatric patient after a violent physical altercation with his brother over the type of food that ought to be given to their invalid father. On October 23, 1975, while Albert Niccoli was still a patient at Leech Farm, Emil Niccoli filed a petition in the Orphans' Court Division of the Court of Common Pleas of Allegheny County seeking the civil commitment of his brother pursuant to section 406 of the Mental Health and Mental Retardation Act of 1966 [the Act].[1] The petition

---

1. Act of October 20, 1966, Special Sess. No. 3, P.L. 96, Art. IV, § 406, 50 P.S. § 4406. The section provides in its entirety:

   "(a) Whenever a person is believed to be mentally disabled, and in need of care or treatment by reason of such mental disability, and examination of such person has been made by a physician or physicians, or for any reason the examination of such person cannot be made, a petition may be presented to the court of common pleas of the county in which a person resides or is, for his immediate examination or commitment to an appropriate facility for examination, observation and diagnosis.

   (1) The petition may be made by a relative, guardian, friend, individual standing in loco parentis or by the executive officer or an authorized agent of a governmental or recognized non-profit health and welfare organization or agency or any responsible person.

   (2) The petition shall set forth the facts upon which the petitioner bases his belief of mental disability and the efforts made to secure examination of the person by a physician.

   (3) Said court upon consideration of such petition shall: (i) issue a warrant requiring that such person be brought before said court; (ii) fix a date for a hearing which shall be as soon as the warrant is executed, and (iii) notify the parties in interest.

   (4) After hearing, said court may: (i) order an immediate examination by two physicians appointed by said court, or (ii) order the commitment of the person believed to be mentally disabled, to a facility for a period not exceeding ten days for the

represented: "Petitioner believes that Respondent is in need of treatment because of his conduct and actions which constitute not only a disturbance and threat to members of his immediate family and to the public, but also a threat to Respondent's own well-being, and that his examination or commitment to a proper facility in accordance with the provisions of said Act is necessary for his welfare and protection." It further represented that "Petitioner has made efforts to individually secure care and treatment for Respondent, but Respondent has refused to undergo any treatment." The petition also suggested that Respondent be committed to Western Psychiatric Institute and Clinic [Western]. The court directed the sheriff to produce Albert Niccoli for a hearing on October 28. Appellee's counsel noted on the sheriff's form that appellant was to be picked up at Leech Farm.

The scheduled hearing was conducted on that date with the participation of appellant and his court-appointed counsel. Appellee testified that on October 16 appellant had attacked him with a crowbar after objecting to the soup he was feeding their father and that he, appellee, was subsequently cut in a struggle over a knife that was lying on the floor, that his brother had physically attacked him on a number of previous occasions, that ap-

purpose of examination. If the examination can be accomplished by partial hospitalization said court may so direct.

"(b) If, upon examination, it is determined that such person is in need of care at a facility, the examining physicians or director, as the case may be, shall immediately report to said court which may order the commitment of such person for care and treatment.

"In its order of commitment, said court may permit partial hospitalization or outpatient care, or if at any time thereafter the director shall determine such partial hospitalization or outpatient care to be beneficial to the person so committed, the same may be permitted by said court upon application by the director."

This section has been largely repealed and superseded by the Mental Health Procedures Act of 1976 [MHPA], Act of July 9, 1976 [Act 143], § 101 *et seq.*, 50 P.S. § 7101 *et seq.* See MHPA, §§ 304, 502, 50 P.S. §§ 7304, 7502.

pellant had frequently threatened harm to both him and their father and was frequently destructive in the house and given to throwing out food he considered unhealthy. Appellee further testified that his brother had previously been hospitalized as a mental patient on a number of occasions, but that he had refused voluntary out-patient treatment. He did not testify that appellant had voluntarily signed himself into Leech Farm and that he had remained there until the hearing, nor were these facts brought out on cross-examination. Appellant testified in his own behalf, but he appeared to have difficulty focusing on recent events and instead continuously returned in a rambling fashion to the past history of his family. At the conclusion of appellant's testimony, the court ordered him returned to Leech Farm overnight and then taken on the following day to Western to be examined and observed.[2] A second hearing was scheduled for November 7.

2. At the subsequent hearing the court admitted into evidence a written "psychiatric evaluation" of appellant by Dr. Joan G. Ehler, one of his examining physicians at Western. This report stated in part:

"The patient is a 54-year-old white male who was admitted to WPIC on October 29, 1975 on a 406 Commitment for ten days observation. He was admitted from Leech Farm. *This commitment apparently was not asked for by Leech Farm but the brother instituted it anyway.*

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"This is patient's third WPIC admission. He was here 12/29/73 to 2/18/74 and 3/13/74 to 3/25/74 when he was transferred to Mayview State Hospital. He says he only stayed a few weeks at Mayview and his brother Emil signed him out. He then worked for about one year at Herbick and Held Printing Company but hasn't worked for three months prior to admission to the VA hospital. The patient has obvious knife wounds on his face. He tells me his brother has been threatening to cut his throat for approximately six months and he had been carrying a crowbar to protect himself. He feels that his brother wants to be the administrator of the father's will and for that reason doesn't want the patient to be in the house. This is a very unusual family which has caused us difficulties both last year when he was in Western Psychiatric and at the present time. *Both times the patient has been willing to stay in the hospital as a voluntary patient and brother Emil commits him.*

At the November 7 hearing Dr. Stanley Peal testified that he had examined and observed appellant regularly during his stay at Western, that he had diagnosed appellant as suffering from a "manic depressive psychosis" which lessened his "self control, judgment and discretion," that he required in-patient care, and that his condition presently made him dangerous to himself and others. Dr. Peal further testified that appellant recognized his need for further hospital treatment, that he was willing to return to the veterans hospital on a voluntary commitment, and that Leech Farm was willing to accept him as a voluntary patient, but the doctor also stated that "even with his good intentions at this time" it was unlikely that appellant would *remain* willing to stay at the hospital voluntarily because of an inability to carry out his intentions characteristic of his mental disorder. The hearing judge also admitted into evidence, over appellant's objection, a written evaluation by another examining physician stating that appellant "should return to Leech Farm where he is willing to go and receive the necessary help." [3] Appellant himself testified that he felt he would benefit from further treatment at Leech Farm, that he was willing to sign himself in voluntarily and accept the treatment recommended by the doctors there, and that he had done so previously before he was brought to court. Appellant also called as a witness Michael Gildea of the county mental health department, who testified that it was the position of the county that when a facility is willing to accept a patient on a voluntary basis, there is no basis for an involuntary commit-

"At the present time the patient does suffer from Manic Depressive Illness. This is demonstrated by his continually jumping from subject to subject in a hyperactive way; however he says nothing that is obviously delusional. I therefore feel that patient should return to Leech Farm *where he is willing to go and receive the necessary help*. As I said last year, I feel it is very doubtful that these two men can live in the same house. I do not know how to prevent this." [Emphasis added.]

3. See n. 2, supra.

ment under section 406 except in "extraordinary circumstances." The hearing judge, nevertheless, indicated that he would rely solely on the testimony of Dr. Peal, and he proceeded to commit appellant to Leech Farm involuntarily for an indefinite term with no provision for subsequent judicial review. After the court en banc dismissed appellant's exceptions, this direct appeal followed.

■ Instantly, appellant argues that the hearing court deprived him of due process of law by rejecting the concept of "least restrictive alternative" and committing him involuntarily to an indefinite term of hospitalization despite his willingness to be hospitalized on a voluntary basis. Since he admits his desire and does not dispute his need for hospitalization and treatment or challenge the constitutionality of section 406 itself, we need not here determine whether the evidence of "mental disability" adduced was sufficient under the statutory terms or the constitutional requirements. Nor need we ascertain the full extent of due process required in civil commitment proceedings.[4] We observe, however, that although

4. Although Pennsylvania courts have not fully delineated the nature of the process that is due with respect to civil commitment, there is no question that the substantial deprivation of individual liberty inherent in such commitment may only be accomplished in accordance with due-process standards. See *Commonwealth v. McQuaid*, 464 Pa. 499, 347 A.2d 465 (1975); *Commonwealth ex rel. Finken v. Roop*, 234 Pa.Super. 155, 339 A.2d 764 (1975), appeal dismissed 424 U.S. 960, 96 S.Ct. 1452, 47 L.Ed.2d 728 (1976). In *Finken*, supra, the Superior Court held that a challenged commitment proceeding had failed to comply with the implied due-process requirements of section 406. In addition, three members of that court, Judge Hoffman, author of the opinion announcing the judgment, and Judges Jacobs and Spaeth, concluded that section 406 was unconstitutional on its face, but Judge Cercone in his concurring opinion expressly refused to reach the issue of the section's constitutionality; Judge Van der Voort filed a dissenting opinion, joined by President Judge Watkins and Judge Price. For exhaustive and scholarly judicial analyses of due-process considerations pertinent to civil commitment, see *In re Ballay*, 157 U.S. App.D.C. 59, 482 F.2d 648 (1973) and *Lynch v. Baxley*, 386 F. Supp. 378 (D.Ala.1974). See also *Meisel v. Kremens*, 405 F.Supp. 1253 (D.Pa.1975). Compare MHPA, § 304, 50 P.S. § 7304.

section 102 of the Act (50 P.S. § 4102) defines "mental disability" as "any mental illness, mental impairment, mental retardation, or mental deficiency, which so lessens the capacity of a person to use his customary self-control, judgment and discretion in the conduct of his affairs and social relations as to make it necessary or advisable for him to be under care as provided in this Act," the Supreme Court of the United States has recently indicated that there are more stringent limitations on a state's civil commitment power.[5]

Appellant's "least restrictive alternative" theory is premised upon an earlier pronouncement by the Supreme Court in *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960):

> "In a series of decisions this Court has held that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose." [Footnotes omitted.]

The analytical weight given by the Supreme Court to the "least restrictive alternative" concept, however, has varied greatly according to the competing interests involved in a given case, and its status as a constitutional requirement in civil commitment proceedings has not been firm-

---

5. "A finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that that term can be given a reasonably precise content and that the 'mentally ill' can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom." *O'Connor v. Donaldson*, 422 U.S. 563, 575, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975).

Compare MHPA, §§ 301, 304 (50 P.S. §§ 7301, 7304), which requires that in order to be involuntarily treated a person must be "severely mentally disabled" and must pose "a clear and present danger of harm to others or to himself."

ly established. See generally D. Chambers, Alternatives to Civil Commitment of the Mentally Ill: Practical Guides and Constitutional Imperatives, 70 Mich.L.Rev. 1108, 1145–68 (1972). Indeed, in *Sanchez v. New Mexico*, 396 U.S. 276, 90 S.Ct. 588, 24 L.Ed.2d 469 (1970), the Supreme Court dismissed "for want of a substantial federal question" an appeal from a decision by the New Mexico Supreme Court [6] rejecting the principle as a constitutional requirement. Whatever the precedential significance of the one-sentence dismissal in *Sanchez*, a number of federal courts in the course of adjudicating constitutional challenges to various state commitment statutes and procedures have subsequently required those seeking or justifying commitment to explore or disprove the possibility of less restrictive alternatives to total involuntary commitment.[7]

Instantly, however, we need not determine whether the Federal Constitution requires us to accept appellant's position, since we conclude that it is supported by the Act itself, which specifically provides for both voluntary admission and voluntary commitment. Section 401(a) of the Act (50 P.S. § 4401) states: "Any mentally disabled person who desires care in a facility may make appropriate application directly to any facility willing and able to receive him, or to the administrator of the county where the person is or resides, for placement in a facility." Section 402 (50 P.S. § 4402) provides in pertinent part

**6.** *State v. Sanchez*, 80 N.M. 438, 457 P.2d 370 (1968).

**7.** See *Lynch v. Baxley*, 386 F.Supp. 378, 392 (D.Ala.1974); *Welsch v. Likens*, 373 F.Supp. 487, 501–2 (D.Minn.1974); *Lessard v. Schmidt*, 349 F.Supp. 1078, 1095–96 (D.Wis.1972), vacated and remanded on other grounds, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974), reinstated on remand, 379 F.Supp. 1376, 1379 (D.C. Wis.1974), vacated and remanded on other grounds, 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), reinstated on remand, 413 F.Supp. 1318 (D.C.Wis.1976); *Dixon v. Attorney General of the Commonwealth of Pennsylvania*, 325 F.Supp. 966, 973–74 (D.Pa. 1971) (consent decree). In both *Lynch* and *Welsch* the precedential significance of *Sanchez* was explicitly called into question.

that "[a]ny person over eighteen years of age" may make "[a]pplication for voluntary admission to a facility for examination, treatment and care," and that the director of the facility then "shall cause an examination to be made" and "[i]f it is determined that the person named in the application is in need of care or observation, he may be admitted;" a person so admitted "shall be free to withdraw at any time." Section 403 (50 P.S. § 4403) provides that a person over eighteen years of age may make a written application for voluntary commitment to a facility:

"(b) The application shall be in writing, signed by the applicant in the presence of at least one witness. When an application is made, the director of the facility shall cause an examination to be made. If it is determined that the person named in the application is in need of care or observation, he shall be committed for a period not to exceed thirty days. Successive applications for continued voluntary commitment may be made for successive periods not to exceed thirty days each, so long as care or observation is necessary.

"(c) No person voluntarily committed shall be detained for more than ten days after he has given written notice to the director of his intention or desire to leave the facility. . . ."

Both section 402(d) and section 403(d) mandate review "at least annually" by a professional committee of the facility "to determine whether continued care is necessary." Compare MHPA, §§ 201–7, 50 P.S. §§ 7201–7.

■ We thus find in the Act a clear legislative intent not merely to sanction but to encourage necessary psychiatric care and treatment on a voluntary basis to the extent feasible.[8] A similar purpose underlay comparable

---

8. MHPA expresses this intent specifically: "Treatment on a voluntary basis shall be preferred to involuntary treatment; and in every case, the least restrictions consistent with adequate treatment shall be employed." MHPA, § 102, 50 P.S. § 7102.

congressional legislation for the District of Columbia. *In re Ballay*, 157 U.S.App.D.C. 59, 71, 482 F.2d 648, 660–64 (1973). The advantages of voluntary over involuntary hospitalization are well-recognized:

"The advantages of voluntary admissions flow from the absence of compulsion in the initiation of psychiatric treatment. Psychiatric evidence indicates that a patient who recognizes his condition and voluntarily undertakes therapy is more likely to be rehabilitated than one upon whom treatment is forced. Moreover, the consensual relationship between the voluntary patient and the hospital may obviate the legal problems of involuntary commitment--the state's power to infringe fundamental liberties, the procedures by which such power may be exercised, the permissible conditions of hospitalization, and the ability of the patient to obtain release." [Footnotes omitted.]

Developments in the Law, Civil Commitment of the Mentally Ill, 87 Harv.L.Rev. 1190, 1399 (1974). Clearly, however, these advantages are less likely to be realized and persons who recognize their need for hospitalization are less likely to seek it if, after they have applied for voluntary admission or commitment and have been accepted by an appropriate facility on a voluntary basis, they then can be subjected to involuntary commitment without a significant change in their condition, the perception of their condition, or their willingness to be hospitalized.

Aside from the social stigma and psychological complications which may result when a person who voluntarily chooses to be hospitalized is involuntarily committed, a person committed under section 406 for an indefinite term is also at a considerable procedural disadvantage should he subsequently seek his release. While one voluntarily admitted is free to leave at will and one voluntarily committed under section 403 is detained for a term not to exceed thirty days with provision for no more

than ten days additional detention after he gives written notice of his intention to leave, the release of one committed under section 406 is left to the discretion of the facility director or the Secretary of the Department of Public Welfare, see sections 418–20 of the Act (50 P.S. §§ 4418–20), unless the person committed petitions the court for a habeas corpus discharge, pursuant to section 426 (50 P.S. § 4426).[9] In contrast to section 406, both sections 402 and 403 mandate periodic review by the facility of the patient's need for continued hospitalization; if a voluntary patient wishes to leave and the director concludes that continued confinement is necessary, the director must initiate commitment proceedings.

In our view, the Act does not contemplate the drastic abridgment involved in involuntary commitment of the liberty of a person who has been neither accused nor convicted of a crime[10] if its ends can be accomplished on a voluntary basis.[11] Although section 406

9. Compare MHPA, § 304 (50 P.S. § 7304), which limits court-ordered involuntary treatment to specific maximum terms, subject to renewal upon a new petition presented to the court.

10. For provisions relating to persons charged with or convicted of crime, see sections 407–14 of the Act (50 P.S. §§ 4407–14); see also *Commonwealth v. McQuaid,* supra. Compare MHPA, §§ 401–6, 50 P.S. §§ 7401–6.

11. We note that section 406(d)—as well as section 408(e) dealing with the civil commitment of persons charged with crime and detained in a penal institution—authorizes the committing court to permit partial hospitalization or outpatient care in its order of commitment or subsequently upon application by the facility director. Presumably it would therefore be an abuse of discretion for the court arbitrarily to reject these less restrictive alternatives when they are shown to be feasible. See and compare *Commonwealth ex rel. DiEmilio v. Shovlin,* 449 Pa. 177, 181, n. 7, 295 A.2d 320, 323, n. 7 (1972), in which this Court indicated that under section 416 of the Act (50 P.S. § 4416) when a facility director recommends that a person committed by the court be transferred from a maximum security to a minimum security facility, the court must approve the transfer, but if the recommendation is that he be transferred from a minimum security facility to a maximum security one, the Commonwealth would be required to justify the need for this transfer at a hearing. Compare also MHPA, § 102, 50 P.S. § 7102.

does not expressly limit its application to persons unwilling or incapable of deciding to be hospitalized on a voluntary basis, we believe that since appellant himself here sought and was accepted for treatment at an appropriate facility on a voluntary basis and remained there without manifesting any apparent intention to leave, an involuntary commitment under section 406 should only have been ordered upon a satisfactory showing that the voluntary arrangement mutually agreed upon by him and the facility was inadequate to achieve the legitimate purposes of the Act.[12]

Appellee, nevertheless, argues that it was within the discretion of the hearing court not to credit appellant's testimony of his willingness to undergo voluntary hospitalization and treatment, and instead to rely on Dr. Peal's testimony that appellant's mental disability made it unlikely that he would be able to adhere to his stated intentions. Dr. Peal did so testify, although his predictions about appellant's future behavior fell considerably short of certitude.[13] We need not here determine wheth-

12. For example, a showing that he was so dangerous to society or himself that voluntary hospitalization provided inadequate protection. The Act was clearly concerned not only to provide the care necessary to one who suffers from a mental disability, but also to protect society and the individual from the consequences of his disability which may be dangerous. See *Humphrey v. Cady*, 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972).

13. On cross-examination:
"Q. . . . Do you have any reason to believe that if he went to the V.A. on a voluntary basis he wouldn't stay more than a couple of days?
"A. I'm not certain how long he'd stay there. It's difficult for the prediction of that. I do know that on the basis of the type of illness he has that it's unpredictable. Even though he says he would stay as long as the doctors think he should, I don't know whether he would be able to do that, one, even though I think he means what he says—that he wants to stay for treatment. I'm not so sure that while he is there, he will feel the same way then. And I find it difficult to predict that he would.
"Q. So in other words you have no real reason to believe that he wouldn't stay there?

er such speculative testimony would have been sufficient to outweigh appellant's statement of his willingness to be a voluntary patient in the absence of other relevant evidence bearing on the credibility of appellant's intentions,[14] since such other evidence was not here lacking.[15] In addition to appellant's own testimony, there was uncontradicted evidence that shortly after his fight with his brother on October 16 appellant had voluntarily signed himself into Leech Farm and had been accepted by that facility on a voluntary basis, that he had remained there as a voluntary patient until he was removed more than a week later by court order pursuant to

> "A. I just said I didn't—I didn't say—you're just turning around what I just said.
> "Q. I'm asking you whether you have any reason to believe, based on your interview with him, that he will not remain at the V.A. Hospital for treatment?
> "A. And I just answered that.
> "Q. Well, you said,—
> "A. I said I don't know whether he will. But it's likely he would not be able to stay, even with his good intention at this time. Just say that."

14. We observe, however, Dr. Peal did not testify that appellant would not submit to treatment on a voluntary basis, only that it was unlikely he would remain firm in his resolve in the future.

15. This Court has previously had occasion to note that a stricter standard of proof than a mere preponderance of the evidence appears to be required for the deprivation of liberty implicit in civil commitment. *Commonwealth v. McQuaid,* supra, 464 Pa. at 513, 347 A.2d at 472. We need not here determine precisely what this standard should have been. Compare *In re Ballay,* supra, and *Lessard v. Schmidt,* supra (proof beyond a reasonable doubt required in civil commitment), with *Bartley v. Kremens,* 402 F. Supp. 1039 (D.Pa.1975) (clear and convincing proof) and *Lynch v. Baxley,* supra (clear, unequivocal, and convincing evidence). Compare also *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L. Ed.2d 368 (1970) (adjudication of guilt in a juvenile proceeding requires proof beyond a reasonable doubt) with *Woodby v. Immigration and Naturalization Service,* 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966) (deportation of resident alien must be based on clear, unequivocal, and convincing evidence). And see *Barrett v. Barrett,* 470 Pa. 253, 368 A.2d 616 (1977) (where issue is properly raised, imprisonment of civil contemnor requires proof beyond a reasonable doubt that he has present ability to purge himself). Compare MHPA, § 304(f), 50 P.S. § 7304(f) (clear and convincing evidence).

the instant commitment proceeding, and that the facility remained willing to treat him on a voluntary basis.

In our view, the hearing court erred in disregarding this uncontroverted evidence. We cannot approve a proceeding in which a person who has apparently recognized his need for care and treatment at an appropriate facility is, on the basis of a less than accurate petition for commitment,[16] removed from that facility while apparently in the process of receiving that care and treatment, sent to another facility for examination and observation without regard to the examination and observation he has been receiving, and then committed to the original facility on an involuntary basis without regard to the fact that that facility's staff remains willing to treat him on a voluntary basis and presumably believes him capable of being treated on that basis. From this record, we conclude that, before committing him involuntarily, the hearing court should have determined whether or not the proposed voluntary arrangement between appellant and Leech Farm would have been adequate to achieve the legitimate purposes of the Act.[17]

16. The petition stated that ". . . Respondent has refused to undergo any treatment."

17. See n. 10, supra, and accompanying text. The record is unclear as to whether appellant was originally voluntarily admitted (section 402) or voluntarily committed (section 403) to Leech Farm, and as to what his status would have been had the court permitted him to return on a voluntary basis. Appellant's brief suggests that under this voluntary arrangement he would have been free to leave at any time, while Dr. Peal testified that it was his understanding that appellant was willing to be voluntarily committed, which under section 403 would have permitted the facility to deny him immediate release. Since, with regard to the restraints or lack thereof placed upon a person committed by the court under section 406, the Act places broad discretion in the facility director and the Department of Public Welfare *after* commitment (see sections 418–20), we believe that considerable weight should have been given to the facility's determination of the appropriate status for appellant in view of its previous experience with him. If that status would have been one of voluntary commitment, the possibility that he might subsequently choose to leave the facility prematurely would seem less significant, since the director would then have been able to detain him long

Because of our disposition of this appeal, we refrain from addressing ourselves to appellant's contention that the court below also erred in admitting into evidence the written report of Dr. Ehler without her also being present to testify.

The decree of the hearing court is vacated, and the record is remanded for further proceedings consistent with this opinion and the provisions of MHPA to the extent applicable.

Former Chief Justice JONES did not participate in the decision of this case.

NIX, J., did not participate in the consideration or decision of this case.

ROBERTS, J., filed a concurring opinion.

MANDERINO, J., filed a dissenting opinion.

ROBERTS, Justice, concurring.

I agree with the majority that the trial court did not apply the correct standard in determining whether appel-

enough to initiate new commitment proceedings under section 406, should that have been deemed necessary. If the status would have been one of voluntary admission, his freedom to leave the facility at any time would have had to be evaluated in light of the extent of the *immediate* dangerousness to himself and others he would present were he to sign himself out before commitment proceedings could have been initiated, whether emergency proceedings under section 405 (50 P.S. § 4405) or new proceedings under section 406.

We recognize that "voluntary" hospitalization may be subject to abuse, particularly in cases where for reasons of administrative convenience the patient is coerced into signing himself into a facility in lieu of his procedural rights in a judicial commitment hearing. Such arrangements, of course, are not truly voluntary. See generally J. Gilboy and J. Schmidt, 'Voluntary' Hospitalization of the Mentally Ill., 66 Nw.L.Rev. 429 (1971) (examining and criticizing voluntary procedures in Illinois). Compare MHPA, § 203, 50 P.S. § 7203. On this record, however, we find no evidence of such coercion and no indication that appellant's willingness to be hospitalized and treated was anything but voluntary. Further, the provisions of section 402 and 403 that would have been applicable to appellant obviate against lengthy involuntary hospitalization without judicial proceedings. Cf. *In re Buttonow*, 23 N.Y.2d 385, 297 N.Y.S.2d 97, 244 N.E.2d 677 (1968).

lant should have been involuntarily committed under the Mental Health and Mental Retardation Act of 1966, Act of October 20, 1966, P.L. 96, §§ 101 et seq., 50 P.S. §§ 4401 et seq. (1969).

However, subsequent to the involuntary commitment proceedings here, the Legislature enacted the Mental Health Procedures Act of 1976, Act of July 9, 1976, §§ 101 et seq., 50 P.S. § 7101 et seq. Although I believe that the new statute may apply to appellant on appeal, I need express no opinion as to the proper disposition under the new statute. In my view on remand, the trial court should apply the Mental Health Procedures Act of 1976 in determining whether appellant should be involuntarily committed.

MANDERINO, Justice, dissenting.

I disagree with the majority and with the concurring opinion of Mr. Justice Roberts in the conclusion that this case must be remanded. If the correct test to apply in an involuntary commitment is whether the individual presents a danger to himself or others, I would conclude, as a matter of law, that an individual *currently receiving treatment* under a *voluntary commitment* cannot possibly present any greater danger to himself or others than would be present under the terms of an *involuntary commitment*. In other words, simply changing the terms of commitment from voluntary to involuntary would not eliminate any dangers that have not been controlled under the terms of a voluntary commitment.