526 Pa. 418 (1991)
586 A.2d 909
In re J.S.
Appeal of PHILADELPHIA COUNTY OFFICE OF MENTAL HEALTH AND MENTAL RETARDATION.
Supreme Court of Pennsylvania.
Submitted October 26, 1990.
Decided February 6, 1991.
*419 Eric M. Jacobs, John W. Wiggins, Philadelphia, for appellant.
John W. Packel, Chief, Appeals Div., Jules Epstein, Asst. Defender, Bradley Bridge, Philadelphia, for appellee.
Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

OPINION
McDERMOTT, Justice.
In this appeal, we must address, for the first time, the interplay between the provisions of the Mental Health Procedures *420 Act[1] which provide procedures for voluntary inpatient treatment for mental illness, and those procedures which apply to involuntary inpatient treatment. In enacting the Mental Health Procedures Act, the General Assembly expressly recognized that "[i]t is the policy of the Commonwealth of Pennsylvania to seek to assure the availability of adequate treatment to persons who are mentally ill, and it is the purpose of this act to establish procedures whereby this policy can be effected. The provisions of this act shall be interpreted in conformity with the principles of due process to make voluntary and involuntary treatment available where the need is great and its absence could result in serious harm to the mentally ill person or to others. Treatment on a voluntary basis shall be preferred to involuntary treatment and in every case, the least restrictions consistent with adequate treatment shall be employed." 50 P.S. § 7102. It is only with these intentions firmly in mind that we may properly resolve the question of statutory construction now before us.
On September 29, 1987, R.S. petitioned the Philadelphia County Office of Mental Health and Mental Retardation, appellant herein, seeking the involuntary commitment of her mother, J.S., for an emergency examination and inpatient treatment for mental illness. An involuntary commitment became unnecessary, however, when J.S., on September 30, 1987, consented to voluntary inpatient treatment at the Thomas Jefferson University Hospital. J.S. consented to the inpatient treatment by signing a consent form. In this form, J.S. agreed that if she chose to withdraw from voluntary inpatient treatment at any time, her release from the hospital could be delayed for a period not to exceed 72 hours from the time she provided notice of her decision to withdraw from treatment:
Before a person is accepted for voluntary inpatient treatment, an explanation shall be made to him of such treatment, including the types of treatment in which he may be involved, and any restraints or restrictions to which he *421 may be subject, together with a statement of his rights under this act. Consent shall be given in writing upon a form adopted by the department. The consent shall include the following representations: That the person understands his treatment will involve inpatient status; that he is willing to be admitted to a designated facility for the purpose of such examination and treatment; and that he consents to such admission voluntarily without coercion or duress; and, if applicable, that he has voluntarily agreed to remain in treatment for a specified period of no longer than 72 hours after having given written notice of his intent to withdraw from treatment. The consent shall be part of the person's record.
50 P.S. § 7203. A patient presumably may choose any amount of delay between the written notice and release which does not exceed 72 hours. Thus, in the event that an individual decides to withdraw from voluntary inpatient treatment, but has not previously agreed to any delay in his release, then he will be immediately released from voluntary treatment upon submitting the written notice. See 50 P.S. § 7206(a).
On October 1, 1987, J.S. indicated to the staff at Jefferson Hospital that she wished to withdraw from voluntary inpatient treatment. As a result, on that day, a psychiatrist at the hospital completed the documents which were necessary to effect an involuntary commitment of J.S., the procedure originally pursued but abandoned when J.S. decided to consent to the voluntary inpatient treatment. In accordance with 50 P.S. § 7302(b)[2], the psychiatrist determined, *422 based upon his examination of J.S., that she was severely mentally disabled and in need of immediate inpatient treatment. J.S. thus became an involuntary inpatient on October 1, 1987.
Severe mental disability is precisely defined in the Mental Health Procedures Act, and it relates to certainly the most serious of mental illnesses. "A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself." 50 P.S. § 7301(a). If a person has made threats of harm and has committed acts in furtherance of the threat to commit harm, this may demonstrate that he or she is a clear and present danger of harm to others. See 50 P.S. § 7301(b). Further, a person represents a clear and present danger to himself if, within the past 30 days, it is established that:
(i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act; or
(ii) the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under the act. For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats *423 to commit suicide and has committed acts which are in furtherance of the threat to commit suicide; or
(iii) the person has substantially mutilated himself or attempted to mutilate himself substantially and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger shall be established by proof that the person has made threats to commit mutilation and has committed acts which are in furtherance of the threat to commit mutilation.
50 P.S. § 7301(b)(2).
In the case sub judice, there is no dispute that hospital personnel followed all of the procedures mandated by the Mental Health Procedures Act in order to properly provide J.S. with involuntary inpatient treatment for her mental illness which was diagnosed at the time as a severe mental disability. According to the applicable statutory provision, once an individual is properly admitted for involuntary treatment for mental illness, he must be discharged whenever it is determined that he is no longer in need of the treatment and in any event within 120 hours, unless within the 120 hour period, he decides to consent to voluntary inpatient treatment or the court or a mental health review officer certifies a longer period of involuntary inpatient treatment. See 50 P.S. § 7303(h). In the case of J.S., the medical professionals involved did seek to continue J.S.'s involuntary inpatient status, on the ground that the seriousness of her mental condition required extended inpatient treatment. As required, J.S. was provided with a hearing within 24 hours of filing of the petition to extend the involuntary inpatient treatment. See 50 P.S. § 7303(b).
The hearing was held on October 5, 1987. In support of the petition, a psychiatrist provided expert testimony concerning the nature of J.S.'s mental illness, and both J.S.'s husband and daughter testified concerning assaultive and self-destructive behavior exhibited by J.S. within the 30 *424 days preceding her hospitalization. The master concluded that J.S. was severely mentally disabled within the meaning of the Mental Health and Procedures Act, and that she did need inpatient treatment. However, the master ordered the release of J.S., because the master believed that, as a procedural matter, J.S. should have been provided with court intervention, a hearing, within 72 hours of having expressed her intention to withdraw from voluntary inpatient treatment.[3]
The Honorable Samuel M. Lehrer of the Court of Common Pleas of Philadelphia County disagreed with the master's construction of the Mental Health Procedures Act. The trial court held that under the applicable statutory provisions, a release of J.S. was not mandated, and that the master could have properly continued J.S.'s involuntary inpatient treatment given the master's conclusion that at the time of the hearing, J.S. was suffering from a severe mental disability.[4] The trial court emphasized that the hospital had complied with all of the conditions for involuntary inpatient treatment as of October 1, 1987, the same day in which J.S. indicated her intention to discontinue her status as a voluntary patient. "We see no violation of due process or other constitutional rights by this interpretation since the admitted purpose and effect of the restraint was for the promotion of the mental health of J.S. . . . This interpretation promotes the salutory purpose of the statute which is to get people in need of treatment into a hospital for examination and treatment." Op. of Trial Court, July 15, 1988, at 9-10.
A panel of the Superior Court, with a two judge majority *425 decision, reversed the trial court.[5] 387 Pa.Super. 432, 564 A.2d 468. The Superior Court correctly recognized that the Mental Health Procedures Act does favor voluntary treatment for mental illness. From this expression of legislative intent, the Court concluded that the procedure followed by the medical professionals in the case at bar was violative of the Mental Health Procedures Act. The Court essentially reasoned that to allow an involuntary commitment procedure under 50 P.S. § 7302 to follow a voluntary commitment procedure, with a 72 hour delay period, would result in a possible eight days of inpatient treatment before the necessity of a hearing, thus "penalizing" those who decide to accept voluntary inpatient treatment. The Superior Court, emphasizing the patient's liberty interest, held that a hearing on the involuntary petition must be held in the time period within which the patient agreed to remain in treatment following expression of a desire to withdraw from voluntary treatment. We accepted the petition for allowance of appeal filed by the Philadelphia County Office of Mental Health and Mental Retardation to resolve this important issue of first impression. We now reverse the decision of the Superior Court.
The clear and central intent of the General Assembly in enacting the Mental Health Procedure was to assure that those individuals who are severely mentally disabled will be provided with the medical care they need, for their own health and safety, and for the safety of others. This Court has recognized that the state has a solemn duty to safeguard the welfare of the individual and, additionally, the state is obliged to protect the welfare of others from the mentally ill person. In re Hutchinson, 500 Pa. 152, 157, 454 A.2d 1008, 1011 (1982) (citations omitted). However, these laudable intentions must be balanced with the individual patient's rights. There is a substantial deprivation of individual liberty inherent in civil commitments such that commitments may only be accomplished in accordance with *426 due process standards. Appeal of Niccoli, 472 Pa. 389, 372 A.2d 749 (1977).
Whether or not preceded by voluntary inpatient treatment, the involuntary commitment of J.S., viewed in isolation for the moment, was both necessary and proper. Given the serious nature of her mental condition on October 1, 1987, medical professionals at Jefferson Hospital followed the letter and spirit of the Mental Health Procedures Act in taking action to continue her medical treatment. On that date, J.S. was so ill that her physician believed she represented a clear and present danger of harm to herself and to others. Given the expressed intent of the legislature in enacting this Act, we are convinced that under such grave circumstances, our General Assembly envisioned that continued inpatient treatment would be available to this person in the interests of her welfare as well as community safety.
We utterly reject the Superior Court's invention of a requirement that where a conversion from voluntary to involuntary inpatient treatment occurs, a hearing must be held within any delay period set by the patient at the time the patient consented to voluntary treatment. There is simply no statutory authority for this proposition. It is not our stead to engraft upon legislation provisions which the General Assembly did not consider or did not see fit to enact. See Commonwealth v. Revtai, 516 Pa. 53, 532 A.2d 1 (1987). It is clear from the language used in 50 P.S. § 7302 that when an individual is properly admitted to involuntary inpatient treatment, he will be provided with court intervention within 120 hours or less. The language of this statutory provision is unambiguous and admits of no exception to the 120 hour time frame. We do not doubt that the 120 hours represents a necessary allotment of time within which medical professionals, friends, and family members, may prepare to present testimony concerning an individual's mental health.[6]
*427 In the involuntary commitment of J.S. on October 1, 1987, until October 5, 1987, when a hearing was held, we can discern of no deprivation of due process. On October 1, 1987, when the involuntary treatment began, J.S. was properly an inpatient at the hospital due to her previous consent to a 72 hour delay in release from voluntary status. When J.S. provided notice of her decision to withdraw from voluntary inpatient treatment, medical professionals acted promptly and, on the same day, her status was converted from that of a voluntary inpatient to that of an involuntary inpatient. There has been no claim in this case that the medical professionals could have acted more quickly in changing J.S.'s patient status, or in providing J.S. with a hearing, or that J.S.'s October 5, 1987, hearing was purposely or unduly delayed. We find that the provisions of the Mental Health Procedures Act require no more of medical professionals faced with such circumstances. We are convinced that the prompt actions undertaken to keep J.S. hospitalized were intended to protect her personal safety and to provide her with necessary medical care.
Our decision today is not in derogation of the General Assembly's stated preference for voluntary inpatient treatment. To the extent feasible, necessary psychiatric treatment on a voluntary basis is to be encouraged. We have previously recognized the benefits which follow from a voluntary hospitalization:
The advantages of voluntary admissions flow from the absence of compulsion in the initiation of psychiatric treatment. Psychiatric evidence indicates that a patient who recognizes his condition and voluntarily undertakes therapy is more likely to be rehabilitated than one upon whom treatment is forced. Moreover, the consensual *428 relationship between the voluntary patient and the hospital may obviate the legal problems of involuntary commitment  the state's power to infringe fundamental liberties, the procedures by which such power may be exercised, the permissible conditions of hospitalization, and the ability of the patient to obtain release.
Appeal of Niccoli, supra 472 Pa. at 399, 372 A.2d at 754 (citation omitted). However, where voluntary treatment is not an available option, this end should not be pursued with a blind eye to a particular patient's serious medical condition and needs. If involuntary treatment is all that is available to protect a person from harm and even death, then the availability of this form of medical treatment is to be valued and encouraged.
The order of the Superior Court is reversed. Given the passage of time since the proceedings reviewed in this decision, we shall not remand this matter to the trial court for further proceedings.
LARSEN, J., dissents.
NOTES
[1] Act of July 9, 1976, P.L. 817, No. 143, § 101, 50 P.S. § 7101 et seq.
[2] 7302. Involuntary emergency examination and treatment authorized by a physician  not to exceed seventy-two hours
* * * * * *
(b) Examination and Determination of Need of Emergency Treatment. 
A person taken to a facility shall be examined by a physician within two hours of arrival in order to determine if the person is severely mentally disabled within the meaning of section 301 and in need of immediate treatment. If it is determined that the person is severely mentally disabled and in need of emergency treatment, treatment shall be begun immediately. If the physician does not so find, or if at any time it appears there is no longer a need for immediate treatment, the person shall be discharged and returned to such place as he may reasonably direct. The physician shall make a record of the examination and his findings. In no event shall a person be accepted for involuntary emergency treatment if a previous application was granted for such treatment and the new application is not based on behavior occurring after the earlier application.
50 P.S. § 7302(b).
[3] According to the record before us, J.S. has, since her release, received outpatient psychiatric treatment.
[4] In the trial court's final order, the court remanded the matter to the master, stating that "It is not the intention of this Court by its order to direct the commitment of J.S. if she is not currently an in hospital [sic] patient and has no need to be committed. Similarly, if in fact J.S. is no longer in need of outpatient treatment, it is not the intention of this Court in this Opinion and Order to require it." Op. of Trial Court, July 15, 1988, at 10.
[5] Judge John T.J. Kelly, Jr., filed a concurring and dissenting opinion. Given our disposition of the merits of this case, we need not address the substance of this opinion.
[6] Further, the result reached by the Superior Court, when closely examined, is not a reasonable one. See 1 Pa.C.S. § 1922(1). Following the Superior Court's analysis, if a voluntary patient has agreed to a delay period of two hours, then he must be provided with a hearing within the two hours or be released, even though all of the procedures mandated for the involuntary commitment of the patient have been met before the expiration of the two hours. This result would presumably occur, even though the patient is, in the opinion of medical professionals, seriously mentally ill and a real and present danger of harm to himself and to others.