Dr. Tom **JACKSON**, Plaintiff,

v.

Dr. **RADCLIFFE**, et al., Defendants.

**Civ. A. No. H–86–4721.**

United States District Court,
S.D. Texas,
Houston Division.

April 13, 1992.

Kenneth G. Norman, Houston, Tex., for plaintiff.

Daniel M. McClure, Stephen R. Kirklin, Mitchell J. Buchman, Jeffrey R. Parsons, Houston, Tex., Richard L. Tate, Richmond, Tex., Kenneth C. Curry, Hurst, Tex., for defendants.

## MEMORANDUM AND ORDER

HARMON, District Judge.

Pending before the Court are the following motions:

(1) Motion for Summary Judgment of defendants Parkway Hospital ("Parkway"), American Medical International, Inc. ("AMI"), Ben Tobias ("Tobias") and Dr. Nicola Perone ("Perone") (# 41);

(2) Motion for Summary Judgment of defendants Dr. Arthur Kirkland, Dr. Victor A. Mendiola and Dr. James K. McNatt (# 37);

(3) Motion for Summary Judgment of defendant Dr. Mohammed Athari (# 40);

(4) Motion to Dismiss of defendants Dr. Arthur Kirkland, Dr. Victor A. Mendiola and Dr. James K. McNatt (# 182);

(5) Motion to Dismiss of defendants Parkway Hospital, American Medical International, Inc., Ben Tobias and Dr. Nicola Perone (# 179).

The motions to dismiss essentially reurge the motions for summary judgment. The motions for summary judgment are brought on essentially the same grounds. Indeed, plaintiff's Memorandum of Points and Authorities (# 58) in response addresses the issues raised by all three motions for summary judgment. Accordingly, the Court consolidates all the motions for summary judgment and to dismiss into a single disposition.

## I. STATEMENT OF FACTS

The instant litigation is the product of a series of events which culminated in the termination of plaintiff's radiology contract with Parkway in 1985. Essentially, the factual background of the suit is as follows.[1] Parkway is owned by AMI. Defendant Tobias was Executive Director of Parkway and a member of its Radiology

---

**1.** In accordance with applicable summary judgment standards, the Court accepts the evidence of the nonmovant as true.

Subcommittee at times pertinent to this lawsuit. Defendant Perone was the Chief of Staff of Parkway's Medical Staff. The other defendants [2] are physicians who practiced medicine at Parkway.

Plaintiff had been associated with Parkway since its opening in 1967. He was in charge of the Radiology Department from that time until August, 1981, when he underwent heart surgery. Following plaintiff's recovery, Parkway's Medical Executive Committee ("MEC") voted that he should continue as Director of Radiology. A Radiology Agreement between Parkway and plaintiff was drawn and signed in early 1983. The agreement provided that plaintiff would administer Parkway's Department of Radiology, and would provide specialists sufficient to provide adequate radiological services to the hospital staff. Parkway retained the right to approve plaintiff's associates. The agreement further provided that staff membership and privileges of all specialists would terminate upon termination of the contract. Plaintiff hired three associates for the Radiology Department, including defendant Dr. Radcliffe.

In late 1984 or early 1985, Dr. P.B. Patil, who had recently joined Parkway's staff, organized a management group at Parkway comprised of thirty to forty doctors, most of whom were on the active staff at Parkway. The management group included defendant Drs. Kirkland, Mendiola, McNatt and Athari. The management group was organized for the purpose of forming an "HMO."

A number of problems developed between plaintiff, Parkway and several other doctors within the hospital. These problems need not be recounted here in chapter and verse, except to note that several doctors complained of plaintiff's mismanagement of the Radiology Department and that there were at least two votes of "no confidence" taken, both of which plaintiff survived. Plaintiff, however, would later be terminated.

Plaintiff was a partner in Parker Road Investors ("PRI"), a partnership which owned a professional building, Parkway Towers, adjacent to Parkway Hospital. The partnership included Dr. Patil. Plaintiff alleges that the management group, in an attempt to form the HMO and gain control over Parkway and Parkway Towers, sought to purchase Parkway Towers from PRI for 50% of its appraised value. Plaintiff replied that he would be interested only if AMI subsidized the other 50% of Parkway Towers' appraised value. Plaintiff also alleges that the management group wanted him to pay it 30% of his professional fees in exchange for patient referrals.

AMI refused plaintiff's subsidization proposal. Accordingly, Tobias told the management group that Parkway would not go along with the HMO proposal. The management group then sought to acquire Parkway's ancillary services from AMI, and allegedly threatened Tobias with a physician boycott of Parkway unless AMI complied. The management group allegedly further threatened to have plaintiff's contract terminated if he did not go along with their "kickback scheme."

April, 1985, was a vexing month for the physicians at Parkway. The MEC Radiology Subcommittee terminated Dr. Radcliffe's hospital privileges and directed plaintiff to fire Dr. Radcliffe without cause. Plaintiff complied. On or about April 23, 1985, there was held a medical staff meeting as part of a social function. One physician, Dr. Mendoza, complained that the MEC was making secret decisions regarding the Radiology Department, namely the termination of Dr. Radcliffe, behind the medical staff's back and without providing reasons for the termination. A heated discussion regarding the termination of Dr. Radcliffe ensued. Dr. Mendoza moved to reinstate Dr. Radcliffe until a special meeting of the staff could be held, which motion carried, even though Dr. Radcliffe was contractually ineligible for rein-

2. On February 8, 1990, the Court dismissed Dr. Patil as a defendant. By stipulation, the parties dismissed defendant Dr. Radcliffe.

statement due to contract restraints with plaintiff.[3]

At that same meeting, defendant Dr. Mendiola then submitted a motion to terminate plaintiff's contract and give temporary privileges to Drs. Lee and Radcliffe until a search committee could recommend a new radiology group, raising the issue under "other business." The staff voted thirty-seven to zero to terminate plaintiff's Radiology Agreement. On May 14, 1985, Tobias delivered a letter to plaintiff, officially terminating his Radiology Agreement with Parkway and giving ninety days' notice. As reasons for the termination, Tobias cited inadequate service, disharmony within the department, not appointing a department director, not forming a partnership, not being personally present often enough, not performing enough exams, not reading enough films and terminating Dr. Radcliffe. Plaintiff alleges that the minutes of the Radiology Subcommittee regarding Dr. Radcliffe's termination were deliberately withheld from the MEC, the Board of Directors and the medical staff prior to his official termination.

A search committee of seven members, four of whom were members of the management group, was formed to find a new radiology group. In order to allow the other members of his radiology partnership to pursue the new radiology contract at Parkway, plaintiff entered into a Financial Agreement with Drs. Wood, Guerra–Paz, Gomez and Lee (the "Wood Group") which released them from the restrictive covenant contained in their Partnership Agreement with plaintiff ("Release") and provided for payment of $525,000.00 to plaintiff. The Wood Group was one of three radiology groups considered. One group was disqualified, leaving only the Wood Group and the "Abdo Group." The Wood Group and the Abdo Group were to address the medical staff at its July 23, 1985, meeting.

On July 15, 1985, however, the search committee disqualified the Wood Group. The Wood Group had been instructed to deliver the Release before a July 15, 1985, meeting of the search committee to convene at 4:30 p.m. The Release letter was allegedly delivered at 2:00 p.m., but the Wood Group representative was told that the Wood Group had been disqualified because the meeting had been moved up to 1:30 p.m., and that, therefore, the Release was not delivered on time. Therefore, on July 22, 1985, the Board of Directors of Parkway met with the MEC and unanimously approved the Abdo Group. Plaintiff alleges that this deprived him of the opportunity to sell his practice for $525,000.00.

Plaintiff further alleges that between May and August, 1985, after his termination, but before it took effect, Drs. Patil, Athari and McNatt, on behalf of the management group, sought to force him to sell his practice to them. He further alleges that they threatened him with a boycott and threatened to install a CAT scan operation and run him out of business if he did not sell. A CAT scan operation was installed in Parkway Towers prior to the effective date of plaintiff's termination, allegedly in violation of plaintiff's exclusive agreement to practice radiology there. Allegedly again threatened with boycott, plaintiff was forced to sell his practice for $65,000.00, which he claims was well under its value.

All of these events, plaintiff asserts, amount to a conspiracy on the part of the defendants to take control of Parkway, Parkway Towers and the affiliated medical services, and to oust plaintiff from his practice because he would not go along with the threats of boycott and the "kickback scheme." Plaintiff has asserted a number of causes of action in his First Amended Complaint:

(1) Denial of procedural and substantive due process;

(2) Tortious interference;

(3) Breach of contract as to defendant Dr. Radcliffe;

---

**3.** Apparently, Dr. Mendoza erroneously believed that Dr. Lee had been terminated along with Dr. Radcliffe.

(4) Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.A. §§ 1961–68 (West 1984 & Supp.1991);

(4) Civil conspiracy;

(5) Violation of federal and state antitrust laws; and

(6) Breaches of fiduciary duty.

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

▆ Rule 56(c) provides that "[summary] judgment shall be rendered forthwith if the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the initial burden of informing the district court of the basis for its motion, and identifying those portions of the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The moving party has the burden of showing that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Williams v. Adams*, 836 F.2d 958, 960 (5th Cir.1988). The burden is not on the movant to produce evidence showing the absence of a genuine issue of material fact. *See International Ass'n of Machinists & Aerospace Workers, Lodge No. 2504 v. Intercontinental Mfg. Co.*, 812 F.2d 219, 222 (5th Cir.1987). A defendant who moves for summary judgment may rely on the absence of evidence to support an essential element of the plaintiff's case. *Id.*

▆ Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. *See Celotex*, 477 U.S. at 324–25, 106 S.Ct. at 2547–48. A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986). Assertions unsupported by facts are insufficient to oppose a motion for summary judgment. *Williams v. Weber Management Serv.*, 839 F.2d 1039, 1041 (5th Cir.1987). There must be evidence giving rise to reasonable inferences that support the nonmoving party's position. *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir.1987). Bare or mere allegations are insufficient. *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 79 (5th Cir.1987).

▆ In considering a motion for summary judgment, the district court must view the evidence through the prism of the substantive evidentiary burden. *Anderson*, 477 U.S. at 254, 106 S.Ct. at 2513. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. *Id.* at 254, 106 S.Ct. at 2513. The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Electric Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Summary judgment is inappropriate if the evidence before the court, viewed as a whole, could lead to different factual findings and conclusions. *Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir.1987).

### B. THE APPLICABLE LAW

#### 1. FEDERAL ANTITRUST

▆ Plaintiff's federal antitrust claim is brought under § 1 of the Sherman Act.[4] Section 1 provides:

---

**4.** Plaintiff's First Amended Complaint does not refer to any specific antitrust provision. His Memorandum of Points and Authorities (#58), however, specifically refers to section 1 of the Sherman Act.

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C.A. § 1 (West Supp.1990). Conspiracies in restraint of trade must be unreasonable to be actionable under § 1. *Northwest Wholesale Stationers, Inc. v. Pacific Stationary and Printing Co.,* 472 U.S. 284, 105 S.Ct. 2613, 2616–17, 86 L.Ed.2d 202 (1985). In his First Amended Complaint, plaintiff's antitrust claim is stated as follows:

> The facts supporting an antitrust claim are those relating to the threats to have Dr. Jackson's contract terminated if he did not go along with the kickback scheme and the threats of boycott. Conversely, one of the threats by the Patil group was to install a CAT scan operation and run Dr. Jackson out of business. The installation of such an operation would increase competition, and therefore could not be in restraint of trade. However, the other threats made by the Patil group and the fact that Dr. Jackson's contract was terminated support an antitrust cause of action.

First Amended Complaint at 27.

Defendants contend that plaintiff cannot prove the existence of three prerequisites for a violation of § 1: (1) conspiracy, (2) restraint of trade and (3) significant effect on competition. In addition, defendants Parkway, AMI, Tobias and Nicola contend that plaintiff cannot show antitrust injury and effect on interstate commerce. As the Court concludes that no unreasonable restraint on trade has occurred, it is unnecessary to address defendants' other contentions.

■ Proof that a restraint of trade is unreasonable may proceed along two lines of proof, depending upon which applies. Under the "rule of reason," the plaintiff must show that defendants engaged in a conspiracy to produce an anticompetitive effect on the relevant market. *Consolidated Metal Products, Inc. v. American Petroleum Institute,* 846 F.2d 284, 289 (5th Cir.1988). The *"per se* rule," on the other hand, requires the plaintiff to show that the acts engaged in by the members of the conspiracy constitute acts which are presumed to have anticompetitive effect. *Id.* Acts which fall within the *per se* rule are deemed illegal, usually with little inquiry into their effect.

■ The Fifth Circuit has recently quoted relevant Supreme Court case law governing the *per se* rule:

> In *Northwest Wholesale Stationers,* the Supreme Court stated that section 1 claims should be subject to rule of reason analysis unless the challenged action falls into the category of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."
>
> ... The decision to apply the *per se* rule turns on "whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output ... or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.'"

*Id.* at 289–90. Certain "group boycotts" and "concerted refusals to deal" are so likely to restrict competition without any efficiency gains that they are condemned as *per se* violations of § 1. *Northwest Wholesale Stationers,* 105 S.Ct. at 2617. The mere allegation of a concerted refusal to deal, however, does not make the case ripe for *per se* condemnation. *Id.* at 2617–18. The issue before this Court is whether the actions taken by the defendants in this case are properly viewed as a group boycott or concerted refusal to deal warranting *per se* condemnation.

In *Northwest Wholesale Stationers,* the Supreme Court described the parameters of the *per se* rule as applied to refusals to deal as follows:

> Cases to which this Court has applied the *per se* approach have generally involved joint efforts by a firm or firms to disadvantage competitors by "either di-

rectly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." ... In these cases, the boycott often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete, ... and frequently the boycotting firms possessed a dominant position in the relevant market.

. . . .

... The act of expulsion ... does not necessarily imply anticompetitive animus and thereby raise a probability of anticompetitive effect.... Unless the cooperative possesses market power or exclusive access to an element essential to effective competition, the conclusion that expulsion is virtually always likely to have an anticompetitive effect is not warranted.

*Id.* at 2619–20. In *Northwest Wholesale Stationers,* the Supreme Court used this reasoning in holding that the *per se* rule did not apply to the expulsion of a member of a wholesale purchasing cooperative. The Fifth Circuit has added that the "touchstone of *per se* illegality is that the customers or the suppliers of the plaintiff had, as a group, agreed or been forced to cease doing business with the plaintiff." *Consolidated Metal,* 846 F.2d at 291.

In *Goss v. Memorial Hosp. System,* 789 F.2d 353, 355 (5th Cir.1986), a physician whose staff privileges were suspended brought an antitrust claim against his former hospitals and certain physicians. The court held that the *per se* rule did not apply because the summary judgment evidence before the court failed to show that the hospitals possessed "market power or exclusive access to an element essential to effective competition." *Id.* at 355 (quoting *Northwest Wholesale Stationers,* 105 S.Ct. at 2621). The court noted that the defendant hospitals were two out of over sixty hospitals in Harris County, Texas. The defendant hospitals possessed a small fraction of the total available hospital beds and total patient admissions in Harris County.

■ As in *Goss,* there is no basis before this Court to declare the actions of the defendant in the case at bar *per se* illegal. The undisputed summary judgment evidence before this Court demonstrates that the market share of Parkway is a small fraction of the total hospital market in Harris County. Further, the evidence demonstrates that plaintiff is one of 250 radiologists in Harris County. There is no evidence that the defendants possessed "market power or exclusive access to an element essential to effective competition." *Id.* 105 S.Ct. at 2619–20. Plaintiff was not denied anything he needed to compete with other radiologists in the marketplace. There is no evidence that the actions of the defendants affected the market for radiology services in Harris County in any way. Also, plaintiff was never precluded from practicing medicine elsewhere.

■ Accordingly, plaintiff's antitrust claim must be analyzed under the rule of reason. Turning again to the Fifth Circuit, that court eloquently summed up the rule of reason as follows:

As this Court said in *Northwest Power Products v. Omark Industries,* [576 F.2d 83 (5th Cir.1978)] "[t]o prove an antitrust violation under the rule of reason ... [plaintiff] must show the defendant's conduct adversely affected competition". That is, the rule of reason requires plaintiffs to show that the defendants' actions amounted to a conspiracy against the market—a concerted attempt to reduce output and drive up prices or otherwise reduce consumer welfare. Under the rule of reason, the antitrust laws protect competition, not particular competitors.

. . . .

... Under the rule of reason, the plaintiff must establish two elements basic to an anticompetitive conspiracy: (1) that the defendant engaged in some sort of joint action and (2) that this joint action amounted to an unreasonable restraint on trade.

. . . .

... Under section 1, an unreasonable restraint of trade "may be established by

proof of *either* an unlawful purpose or an anticompetitive effect."

*Consolidated Metal,* 846 F.2d at 292–94.

Aside from the element of conspiracy, there is no summary judgment evidence before the Court which raises a genuine issue of material fact of an unreasonable restraint on trade. In short, there is no evidence of either an unlawful purpose to restrain trade or of an anticompetitive effect.

For all the foregoing reasons, defendants are entitled to summary judgment on plaintiff's antitrust claim under section 1 of the Sherman Act.

### 2. RICO

Movants seek summary judgment on plaintiff's RICO claim on the basis that plaintiff cannot raise a genuine issue of material fact of elements necessary to sustain a RICO cause of action. Proof of a RICO violation "requires: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). Defendants argue that plaintiff cannot raise a genuine issue of material fact as to these elements.

■ Without the necessity of analyzing all of the requirements necessary to sustain a RICO cause of action, this Court is of the opinion that plaintiff has failed to raise a genuine issue of material fact which demonstrates that defendants engaged in a pattern of racketeering activity. A pattern of racketeering activity requires "at least two acts of racketeering activity." 18 U.S.C. § 1961(5). "Racketeering activity" is defined as any act indictable under certain federal criminal statutes such as mail and wire fraud, or "chargeable" under certain state criminal laws, including bribery. 18 U.S.C. § 1961(1). Unless plaintiff is able to raise a genuine issue of material fact as to at least two acts of racketeering

activity, defendants are entitled to summary judgment. *See In re Lewisville Properties, Inc.,* 849 F.2d 946, 950–51 (5th Cir.1988).

■ In his response to the motions for summary judgment, plaintiff asserts that defendants are guilty of at least two acts of "extortion and/or commercial bribery" in violation of Tex.Pen.Code Ann. § 32.-43(b). Section 32.43(b) provides:

> A person who is a fiduciary commits an offense if, without the consent of his beneficiary, he intentionally or knowingly solicits, accepts, or agrees to accept any benefit from another person on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary.

Tex.Pen.Code Ann. § 32.43 (Vernon 1989). Plaintiff argues that defendants breached a fiduciary duty to him in violation of the statute in at least two ways, thereby satisfying the requirement of the RICO statute of at least two predicate acts.

This Court is of the opinion, as a matter of law, that plaintiff cannot show that any of the defendants violated § 32.43(b). The commentary to § 32.43 states that the provision "does not reach a simple breach of fiduciary duty; it covers only corrupt breaches that involve a bribe." There was no bribe in the instant case or any other type of benefit offered to any fiduciary to induce or in any way alter the course of conduct of a fiduciary to a beneficiary. In sum, the factual scenario contemplated by § 32.43(b) is completely dissimilar to the facts of the instant case.

■ There being no summary judgment evidence of a pattern of racketeering, defendants are entitled to summary judgment on plaintiff's RICO claim.[5]

---

**5.** In his First Amended Complaint, but not in his response to the motion, plaintiff refers to fee-splitting in violation of the Texas Medical Practice Act. Assuming *arguendo* that such a violation even occurred, it would not constitute a predicate act for purposes of the RICO statute. A "racketeering activity," with regard to acts committed in violation of state law, includes

only offenses punishable by imprisonment in excess of one year. 18 U.S.C. § 1961(1). Violations of the Texas Medical Practice Act, however, are Class A misdemeanors, Tex.Rev.Civ. Stat.Ann. art. 4495b § 3.07(a) (Vernon Supp. 1990), which are punishable for a term not to exceed one year, Tex.Pen.Code Ann. § 12.21 (Vernon 1974).

■ Moreover, another independent basis for dismissal of plaintiff's RICO claim exists. A RICO plaintiff must establish that there was a "pattern of racketeering activity." *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir.1988), *cert. denied,* 489 U.S. 1079, 109 S.Ct. 1531, 103 L.Ed.2d 836 (1989). A "pattern of racketeering activity" requires the commission of at least two predicate acts set forth in 18 U.S.C. § 1961(1).

■ "Racketeering activity" alone does not violate RICO. Rather, the activity must have some nexus with the "enterprise." *United States v. Erwin,* 793 F.2d 656, 671 (5th Cir.), *cert. denied,* 479 U.S. 991, 107 S.Ct. 589, 93 L.Ed.2d 590 (1986). In *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court held "that to prove a pattern of racketeering activity a plaintiff ... must show that the racketeering acts are related and that they amount to or pose a threat to continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 109 S.Ct. at 2900; *Calcasieu Marine National Bank v. Grant,* 943 F.2d 1453, 1463 (5th Cir.1991) (the Fifth Circuit noted that "[w]e can no longer use the broad pattern definition adopted in *R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350, 1355 (5th Cir.1985)). Racketeering acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 109 S.Ct. at 2900; *Landry v. Air Line Pilots Ass'n Intern. AFL–CIO,* 901 F.2d 404, 432 (5th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990). A plaintiff may be able to "prove that the multiple predicates alleged constitute 'a pattern of racketeering activity,' in that they satisfy the requirements of relationship and continuity." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 109 S.Ct. at 2906; *see also Abell v. Potomac Ins. Co. of Illinois,* 946 F.2d 1160, 1164 (5th Cir.1991),

*petition for cert. filed,* March 10, 1992. A pattern of racketeering activity calls for a showing "that the racketeering predicates [6] are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 109 S.Ct. at 2900.

■ A party may show "continuity over a closed period by proving a series of related predicates extending over a substantial period of time," or by proving "past conduct that by its nature projects into the future with the threat of repetition." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 109 S.Ct. at 2902. Isolated instances of wrongdoing to secure separate and discrete goals pose no threat of continued criminal activity. " 'Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the pattern] requirement.' " *Calcasieu Marine National Bank v. Grant,* 943 F.2d at 1464 (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.,* 109 S.Ct. at 2902). The acts that deprived Dr. Jackson of his position and his practice were, when completed, without threat of repetition. *Calcasieu Marine National Bank v. Grant,* 943 F.2d at 1464. The Fifth Circuit, citing *H.J. Inc. v. Northwestern Bell Tel. Co.,* noted that short term criminal conduct is not the concern of RICO. *Id.*

There is no "pattern of racketeering activity" to support Dr. Jackson's RICO claim. For this added reason, summary judgment should be granted in favor of the defendants on plaintiff's RICO claim. *Id.*

### 3. JURISDICTION

■ The motions urge this Court to dismiss the entire case in the event that summary judgment is entered on the federal antitrust and RICO claims on the ground that this Court no longer has jurisdiction. The Court declines to dismiss the case on this ground. First, plaintiff, in his First Amended Complaint, has asserted a cause of action for denial of procedural and sub-

---

**6.** Plaintiff must show the commission of at least two predicate offenses on a specified list codified at 18 U.S.C.A. §§ 1961(1), (5) (Supp.1991).

*Abell v. Potomac Ins. Co. of Illinois,* 946 F.2d at 1164–65.

stantive due process [7] on which no party has sought summary judgment. Second, due to the age of this case and the volume of work already expended on its preparation, this Court would continue to assert jurisdiction over the pendent claims under the standard of "considerations of judicial economy, convenience and fairness to litigants," even had summary judgment been granted on all federal claims. *E.g., Ingram Corp. v. J. Ray McDermott & Co.,* 698 F.2d 1295, 1320 (5th Cir.1983).

### 4. PENDENT CLAIMS

#### a. Texas Antitrust

The Texas Antitrust Act provides that it shall be "construed in harmony with federal judicial interpretations of comparable federal antitrust statutes." Tex.Bus. & Com.Code Ann. § 15.04; *see also Times Herald Printing Co. v. A.H. Belo Corp.,* 820 S.W.2d 206, 211 (Tex.App.—Houston [14th Dist.] 1991, no writ). Therefore, for all the reasons set forth in the federal antitrust portion of this Memorandum and Order, the Court grants summary judgment to the defendants as to the Texas antitrust claim.

#### b. Tortious Interference

All defendants move for summary judgment on this claim. This claim is pled as follows:

> Similarly, the Management Group, including Dr. Patil and the other doctors individually involved in the kickback scheme, engaged in tortious interference with Dr. Jackson's business relationships with the hospital. One month after Dr. Jackson refused to go along with the kickback scheme, his contract was terminated under questionable circumstances. Drs. Patil, Mendiola, Kirkland, and others involved in the Management Group demanding the 30 percent were also intimately involved in the events at the April 23, 1985 meeting at which the staff voted to terminate Dr. Jackson's contract, as

well as the actions taken by the Search Committee, the Medical Executive Committee and the Board of Directors.

First Amended Complaint at 25–26.

Obviously, plaintiff has not asserted a cause of action for tortious interference against Perone, Tobias, Parkway and AMI. Therefore, the motion for summary judgment of those parties is granted as to this claim.

■ Tortious interference with existing contracts consists of the following elements: (1) the existence of a contract that is subject to interference; (2) an intentional and willful act interfering with the contract; (3) that proximately caused; a (4) specific economic loss to the claimant as a direct result of the intentional act. *Times Herald Printing Co. v. A.H. Belo Corp.,* 820 S.W.2d 206, 215 (Tex.App.—Houston [14th Dist.] 1991, no writ); *Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.,* 793 S.W.2d 660, 664 (Tex.1990).

■ "Until terminated, a contract is valid, and third persons may not interfere with it." *Times Herald Printing Co. v. A.H. Belo Corp.,* 820 S.W.2d at 215 (citing *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 689 (Tex.1989)). Third persons are "not free to interfere tortiously with [the] *performance* of a contract *before* it is avoided." *Sterner v. Marathon Oil Co.,* 767 S.W.2d at 689 (emphasis added). On August 12, 1985, plaintiff's Radiology Agreement was terminated without cause.[8] Plaintiff was given ninety days' notice pursuant to the terms of the Radiology Agreement.[9]

In *Times Herald,* the court concluded that where a contract could be terminated with notice there can be no tortious interference with a contract as there is only an expectancy because "a competitor is free to cause the termination [of a contract] and obtain the future benefits for his own com-

---

**7.** *See* First Amended Complaint at 23–24.

**8.** Defendants Kirkland, Mendiola, and McNatt's Motion for Summary Judgment Ex. 1.

**9.** Defendants Kirkland, Mendiola, and McNatt's Motion for Summary Judgment Ex. 8, p. 11, ¶ 6.3–4.

petitive advantage...." [10] *Times Herald Printing Co. v. A.H. Belo Corp.*, 820 S.W.2d at 215 (citing, RESTATEMENT [SECOND] OF TORTS § 768(i) (1979)). Therefore, according to the termination and notice provisions of the Radiology Agreement, Dr. Jackson retained only "a prospective contractual relation for which [he] had no assurance, only an expectancy, under contracts that were terminable at will." *Times Herald Printing Co. v. A.H. Belo Corp.*, 820 S.W.2d at 215.

Moreover, privilege serves as a defense to a claim for interference with contractual relations. *Gillum v. Republic Health Corp.*, 778 S.W.2d 558, 566 (Tex. App.—Dallas 1989, no writ). One is privileged to interfere in another's contract if (1) it is done in a bona fide exercise of one's own rights, or (2) if one has an equal or superior right in the subject matter to that of the plaintiff. *Sterner v. Marathon Oil Co.*, 767 S.W.2d at 691. The determination of whether a defendant's conduct is privileged is a question of law for the court. *See Sterner v. Marathon Oil Co.*, 767 S.W.2d at 690–91.[11]

AMI, and the physicians associated with it, has the right to control its practices through its contracts and by-laws where AMI clearly has a superior interest in the manner in which the hospital is operated. *Gillum v. Republic Health Corp.*, 778 S.W.2d at 566.

Plaintiff, therefore, has not supported this claim with sufficient summary judgment evidence demonstrating that the defendants interfered with any of his "contractual rights."

### c. Breach of Contract

The motion for summary judgment filed by defendants Parkway, AMI, Tobias and Perone, addresses a claim for breach of contract. In his First Amended Complaint, however, plaintiff asserts a claim for breach of contract against defendant Dr. Radcliffe only,[12] who was dismissed by stipulation of the parties on July 25, 1990 (# 200). To the extent a ruling is needed, summary judgment is granted on plaintiff's claim for breach of contract as to all defendants.

### d. Breach of Fiduciary Duty

In his First Amended Complaint, plaintiff asserts a cause of action against his PRI partners, particularly Kirkland, for breach of fiduciary duty. Although it would appear that plaintiff asserted a claim for breach of fiduciary duty against only his PRI partners in his First Amended Complaint, his response to the motions argues breach of fiduciary duty against defendants Kirkland, McNatt, Athari, and Mendiola. Nevertheless, this Court is of the opinion that there is insufficient summary judgment evidence to impose a fiduciary duty upon anyone other than plaintiff's PRI partners.

The Court, however, is of the opinion plaintiff's PRI partners' summary judgment on this issue should be denied.

### e. Civil Conspiracy

The essential elements of a claim of civil conspiracy include: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983); *Adolph Coors Co. v. Rodriguez*, 780 S.W.2d 477, 486 (Tex.App.—Corpus Christi 1989, writ denied). The object of this alleged conspiracy was the termination of Dr. Jackson's agreement with AMI.[13]

---

**10.** It remains undisputed that several physicians were disenchanted with Dr. Jackson's radiological services and sought to replace him.

**11.** "[T]he privilege of legal justification or excuse in the interference of contractual relations is an affirmative defense upon which the defendant has the burden of proof." *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989).

**12.** First Amended Complaint at 25.

**13.** Although plaintiff alleges that various "Board and Committee members ... were intimately involved in the Management Group's kickback scheme ..." plaintiff goes on to charge that a civil conspiracy existed to terminate his contract. First Amended Complaint at p. 27.

First Amended Complaint at p. 27. However, lawful cancellation of a contract accomplished by lawful means is not evidence of an agreement to commit an unlawful act. *Times Herald Printing Co. v. A.H. Belo Corp.*, 820 S.W.2d at 216–17.

The Court is of the opinion that the motion should be granted as to defendants Kirkland, Mendiola, McNatt and Athari. There being no other claims remaining against defendants Parkway, AMI, Tobias and Perone, the Court is of the opinion that the motion for summary judgment of these defendants should be granted as to this claim.

## III. CONCLUSION

This Court having considered all other contentions presented concludes, for the reasons set forth above, that the defendants' motions for summary judgment should be granted as to all claims except breach of fiduciary duty. Plaintiff's partners' motion for summary judgment on this point is hereby denied.

### ORDER

In accordance with the foregoing, it is hereby

ORDERED that the motions for summary judgment and to dismiss of defendants Parkway Hospital, American Medical International, Inc., Ben Tobias and Dr. Nicola Perone are hereby in all things GRANTED. It is further

ORDERED that the motions for summary judgment and to dismiss of defendants Dr. Arthur Kirkland, Dr. Victor A. Mendiola and Dr. James K. McNatt, and the motion for summary judgment of Dr. Mohammed Athari are hereby GRANTED as to plaintiff's claims for federal antitrust, RICO, state antitrust, tortious interference with contract, and breach of fiduciary duty as to defendants who were not plaintiff's partners in the Parker Road Investors partnership, and are hereby DENIED as to plaintiff's claims for breach of fiduciary duty as to defendants who were plaintiff's partners in the Parker Road Investors partnership. It is further

ORDERED that Plaintiff's Motion to Reopen Discovery and Motion for Severance are hereby DENIED.