

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-28-1998

# United States v. Parise

Precedential or Non-Precedential:

Docket 97-1740

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"United States v. Parise" (1998). *1998 Decisions.* Paper 254.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/254

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 28, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-1740

UNITED STATES OF AMERICA,
      Appellee

v.

LOUIS PARISE, JR.,
      Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 96-CR-273-2)

Argued April 27, 1998

BEFORE: ALITO, GARTH, and RENDELL
Circuit Judges

(Filed: October 28, 1998)

        BRUCE A. FRANZEL
        Oxenburg & Franzel
        1760 Market Street, Suite 600
        Philadelphia, PA 19103

        Counsel for Appellant,
        Louis Parise, Jr.

        TIMOTHY R. RICE
        Office of the United States Attorney
        615 Chestnut Street, Suite 1250
        Philadelphia, PA 19106

        Counsel for the United States

OPINION OF THE COURT

RENDELL, Circuit Judge.

On January 29, 1997, Louis Parise Jr. and his father, Louis Parise Sr., were convicted of various crimes arising out of their involvement with the National Maritime Union ("NMU"). Parise Jr.'s RICO conviction under 18 U.S.C. S 1962(c) was predicated on his violation of the Pennsylvania commercial bribery statute, 18 Pa. C.S.A. S 4108(c). Specifically, Parise Jr. was found to have delivered cash bribes to two "port agents" in exchange for their referral of union members with personal injury cases to Parise Jr.'s employer, the Sacks law firm.

On appeal Parise Jr. argues that there was insufficient evidence to support his RICO conviction. He also contends that his actions did not constitute commercial bribery under Pennsylvania law. We disagree with his view as to how the law should be applied to the facts of this case, and find that the evidence was sufficient to support his conviction. Parise Jr. also challenges the district court's exclusion of certain testimony relating to the commercial bribery charge. We find this argument to be similarly unavailing. We will thus affirm the order of the district court.

I.

The convictions at issue in this case arose out of an extensive government investigation of corruption within the NMU and several related organizations. The NMU represents merchant marine seafarers who work on commercial shipping vessels. One of the improprieties revealed through the government's investigation was a

2

bribery scheme devised and implemented by Louis Parise Sr., the President of the NMU, his son, Louis Parise Jr., and attorneys Avrem Adler and Bernard Sacks.[1] Through this plan, developed in 1988, port agents and other union employees provided Sacks with personal injury case referrals in exchange for cash payments.[2] As part of the scheme, Parise Jr. was hired as an "investigator" for the Sacks law firm and was responsible for delivering the bribes to the port agents. Parise Sr. promised these legal referrals to Sacks in exchange for a kickback of 5% of the legal fees generated through NMU cases. In 1992, a Legal Services Plan ("LSP") was created through which attorneys were to provide low or no cost legal services to union members. It was hoped that these members would then be more likely to retain designated attorneys, including Sacks, for their more lucrative cases. Parise Jr. was named as "co-administrator" of the LSP.

Sacks cooperated with the government investigation and during the trial testified at length about the bribery scheme. Sacks explained that Parise Jr.'s role was to pay port agents in particular cities a set fee for referral of personal injury cases to the Sacks firm. Several port agents, including Floyd Jones, John Pegan, and Debra Rywelski,[3] testified about the money paid to them by Parise Jr. for these case referrals. Other witnesses provided additional evidence relating to Parise Jr.'s role in the NMU and in carrying out the bribery scheme. After a three week trial, the jury found Parise Jr. guilty of the RICO violation, of Travel Act violations and of RICO forfeiture. The RICO conviction was based on the jury's finding that Parise Jr. had bribed Pegan and Rywelski in violation of Pennsylvania's commercial bribery statute. The district court denied Parise Jr.'s post-trial motion for acquittal or a new trial, and Parise Jr. appeals the judgment of conviction

_____

1. Adler died before this case was brought to trial.

2. Between 1988-93 Sacks earned over $1.4 million in legal fees from these NMU personal injury cases.

3. Rywelski was a NMU employee, but was not officially a "port agent." She served as a Pension and Welfare Plan Representative who helped union members with their benefits.

entered on September 11, 1997. This court has jurisdiction to review the final judgment of the district court pursuant to 28 U.S.C. S 1291.

The jury verdict in this case "must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942). See United States v. Aguilar, 843 F.2d 155, 157 (3d Cir. 1988). To the extent that Parise Jr.'s arguments raise issues of statutory interpretation, our review is plenary. See United States v. Hayden, 64 F.3d 126, 128 (3d Cir. 1995).

II.

A. RICO violation

Parise Jr. offers two related challenges to the sufficiency of the evidence which sustained his conviction under RICO. First, Parise Jr. argues that the government failed to adequately connect him with the indicted "enterprise" because several of the racketeering acts charged in the indictment were committed prior to the existence of the Legal Services Plan, and even those acts which occurred after the formation of the LSP were not directly linked with his role in the LSP. Secondly, Parise Jr. contends that the government failed to demonstrate that he participated in directing the affairs of the enterprise as required to sustain a RICO conviction. In addition, Parise Jr. challenges the district court's jury instruction relating to the requisite showing that must be made to establish "association" under RICO.

1. Connection with an "enterprise"

The RICO statute provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. S 1962(c). A conviction under this statute requires that the government prove the following four elements:

4

(1) the existence of an enterprise affecting inter state commerce; (2) that the defendant was employed by o r associated with the enterprise; (3) that the defen dant participated, either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity.

United States v. Console, 13 F.3d 641, 652-53 (3d Cir. 1993) (citation omitted).

The statute defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. S 1961(4). The indictment in this case charged that four legal entities made up the RICO enterprise: (1) the National Mari time Union ("NMU"); the NMU Pension and Welfare Plan; (3) the Committee for the Administration of the NMU; and (4) the Legal Services Plan ("LSP").

Parise Jr. contends that because the government alleged in the indictment that the enterprise -- which we will call the "NMU Enterprise" -- was comprised of four organizations, no "enterprise" could have existed prior to September 1992, when the fourth organization, the LSP, was created. Therefore, Parise Jr. asserts, alleged illegal activity which took place before September 1992 cannot properly serve as the basis for his RICO liability. 4

Parise Jr.'s argument fails to appreciate the nature of an

_____

4. The indictment characterized Parise Jr.'s role as follows:

From in or about late 1988 to the present . . . Louis Parise, Jr. and
others known and unknown to the grand jury, being persons employed by and associated with the enterprise . . . knowingly, unlawfully, and willfully conducted and participated, directly and indirectly, in the conduct of the affairs of the enterprise . . . .

Defendant Louis Parise, Jr., used his position as an investigator for
attorney Sacks and as a co-administrator of the ITPE-NMU Legal Benefits Plan, to promote and aid and abet commercial bribery by traveling in interstate commerce, and using interstate facilities, to
deliver cash payments and things of value to union officials who referred injured union members to attorney Sacks as their lawyer . . . .

5

"enterprise" as defined by the RICO statute. The four organizations were included in the indictment because all were channels through which illegal activity was taking place and through which the NMU Enterprise operated. This does not mean, however, that no illegal activity of the enterprise could occur prior to the existence or entry of one of the indicted entities. In order to establish the existence of an "enterprise" for the purposes of RICO, the government must demonstrate that there is "an ongoing organization" whose "various associates function as a continuing unit." See United States v. Riccobene, 709 F.2d 214, 221 (3d Cir. 1983) (citing United States v. Turkette, 452 U.S. 576, 583 (1981)). However, "continuity does not require that each member of the enterprise participate in it from beginning to end." United States v. Feldman, 853 F.2d 648, 659 (9th Cir. 1988); see United States v. Hewes, 729 F.2d 1302, 1310–11 (11th Cir. 1984) (rejecting the argument that government must prove participation of all members throughout the life of the enterprise). Rather, the government must demonstrate that all alleged members who participated at one time or another were part of an ongoing enterprise with a shared "organizational pattern" and "system of authority." United States v. Lemm, 680 F.2d 1193, 1199 (8th Cir. 1982).

The evidence adduced at trial demonstrated that the NMU Enterprise existed prior to September 1992 and that upon its formation, the LSP became part of the ongoing enterprise which satisfied the organizational and structural requirements of Riccobene. 709 F.2d at 221. The LSP was developed as another method of generating personal injury cases; the pursuit of these cases was already an activity of the NMU Enterprise. The major participants in the enterprise remained essentially the same from 1988 on, demonstrating the continuity of the enterprise. The testimony showed that during this period Louis Parise Sr. was the "system of authority" which united all of the organizations which formed the NMU Enterprise: the elder Parise had relatively unfettered discretion to direct both the legal and illegal activities of the union and its related organizations. Because the NMU Enterprise existed before the formation of the LSP, Parise Jr.'s actions prior to 1992 could properly form the basis for his RICO conviction.

6

Parise Jr. next asserts that all of the racketeering charges
-- even those relating to post-1992 activity -- are deficient
because the government failed to connect any of his alleged
acts of bribery with his position as co-administrator of the
LSP. Parise Jr. contends that his actions taken while he
was an investigator for the Sacks law firm cannot form the
basis for his RICO conviction because the law firm was not
named as one of the organizations which formed the
"enterprise." However, this argument misconstrues the
government's burden. At trial, the government needed to
demonstrate that Parise Jr. participated, directly or
indirectly, in the conduct of the NMU Enterprise's affairs
through a pattern of racketeering activity. In so doing,
however, the government was not limited to demonstrating
that Parise Jr.'s participation in the affairs of the enterprise
flowed from his official role within the LSP. In fact, from the
evidence adduced at trial it is clear that Parise Jr.'s
eventual position with the LSP was not necessary to
establish that he associated with or participated in the
affairs of the NMU Enterprise. Rather, as is discussed
below, we agree with Parise Jr. that his actions as co-
administrator of the LSP were merely a continuation of his
previously established pattern of racketeering activities.

Parise Jr. also appears to be arguing that he could only
have been found to have "associated with" the organization
in which he held a formal position, but the language of the
RICO statute leaves no room for this contention. The law
explicitly states that a RICO defendant must be employed
by or associated with an enterprise. 18 U.S.C. S 1962(c). For
the purposes of RICO, the threshold showing of
"association" is not difficult to establish: it is satisfied by
proof that the defendant was "aware of at least the general
existence of the enterprise named in the indictment." United
States v. Eufrasio, 935 F.2d 553, 577 n.29 (3d Cir. 1991)
(quoting United States v. Castellano, 610 F. Supp. 1359,
1401-02 (S.D.N.Y. 1985)); see also Console, 13 F.3d at 653.
That is, a defendant must be aware of the general nature of
the enterprise and know that the enterprise extends beyond
his individual role. See United States v. Rastelli, 870 F.2d
822, 828 (2d Cir. 1989). Here, the necessary showing of
"association" was easily met. The evidence showed that
Parise Jr. attended the initial meeting during which the

7

bribery scheme was discussed -- this fact alone is sufficient to demonstrate that he was aware of the NMU Enterprise and knew that the activities of the NMU Enterprise extended beyond his role in bribing union employees.

## 2. Participation in the conduct of the affairs of the enterprise

We now turn our attention to the third element essential to a RICO conviction -- namely, whether the government's evidence demonstrated that Parise Jr. participated in the conduct of the affairs of the enterprise. Our analysis of this claim must begin with an examination of the definition of "participation" under S 1962(c) as clarified by the Supreme Court in Reves v. Ernst & Young, 507 U.S. 170 (1993). In Reves, the Court endorsed the "operation or management" test to determine whether a defendant participated in the conduct of an enterprise's affairs. Id. at 184. According to Reves, "[i]n order to `participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." Id. at 179. However, one need not hold a formal position within an enterprise in order to "participate" in its affairs. Id. at 179. Further, the "operation or management" test does not limit RICO liability to upper management because "an enterprise is `operated' not just by upper management but also by lower-rung participants in the enterprise who are under the direction of upper management." Id. at 184. In so holding, the Court made clear that RICO liability may extend to those who do not hold a managerial position within an enterprise, but who do nonetheless knowingly further the illegal aims of the enterprise by carrying out the directives of those in control.

In applying Reves, we have stated that the "operation or management" test is designed to limit RICO liability under S 1962(c) to those situations in which the government can demonstrate "a nexus between the person and the conduct in the affairs of an enterprise." University of Maryland at Baltimore v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1539 (3d Cir. 1993).5 The First Circuit has stated that RICO

_____

5. Although Reves was a civil RICO case, the "operation or management" test is applicable to criminal RICO cases as well. See, e.g., United States
v. Antar, 53 F.3d 568, 580-81 (3d Cir. 1995).

8

liability extends to those "plainly integral to carrying out" the enterprise's activities. See United States v. Shifman, 124 F.3d 31, 36 (1st Cir. 1997) (citation omitted), cert. denied, 118 S. Ct. 1053 (1998).

It is clear that Parise Jr. participated in the conduct of the affairs of the NMU Enterprise for several years before he was given the formal title of "co-administrator" of the LSP. In his role as investigator for the Sacks law firm, Parise Jr. was integral to the enterprise's plan to funnel personal injury cases to Sacks in order to reap a percentage of the money generated. Parise Jr. traveled to port cities paying off the union agents and informing them that Sacks was the official NMU attorney for the East Coast. Thus, even before he had a formal role within the LSP, Parise Jr. was deeply involved in -- and integral to -- the operation of the NMU Enterprise. The government produced evidence that Parise Jr. was acting at the direction of his father, the union President -- clearly upper level management -- to carry out the illegal activities of the NMU Enterprise. As a result of Parise Jr.'s work, his father, the head of the enterprise, received substantial kickbacks from Sacks.

In 1992, in furtherance of the scheme and reflective of his important role in the enterprise, Parise Jr. became co-administrator of the LSP. Through this official position, he maintained and expanded his role in operating the NMU Enterprise. In addition to continuing the payoff arrangement with port agents, he also coordinated the effort of the LSP to select local attorneys to do the routine legal work for union members -- and to channel more lucrative cases to attorneys selected by Parise Sr.

Reves focused on the RICO liability of those "outside" an enterprise who may assist in furthering the illegal activities of the enterprise. 507 U.S. at 183-85. The Court did not reach the issue of the liability of those "inside," specifically declining to determine "how far S 1962(c) extends down the ladder of operation." Id. at 184 n.9. However, we need not dwell on this issue because Parise Jr.'s substantial involvement in the criminal activities of the NMU Enterprise does not present a close case. We are not concerned with improperly extending RICO liability to a low-level employee who was unaware of the criminal activities of the larger

9

enterprise. See United States v. Viola, 35 F.3d 37, 43 (2d Cir. 1994) (reversing conviction of defendant who did light clean-up and maintenance work on the ground that the government had failed to show that he exercised any "discretionary authority" or that he "was even aware of the broader enterprise"). Sacks testified that Parise Jr. was present during the original meeting where the bribery plan was discussed. The fact that he continued to play an essential role in implementing the scheme was well documented during the trial. Parise Jr. does not contend on appeal that he was an unwitting -- or unwilling-- actor.

From the extensive evidence presented at trial, the jury could easily conclude that the government established a nexus between Parise Jr. and the affairs of the NMU Enterprise. Parise Jr. played a role in directing the affairs of the NMU Enterprise as required by Reves and could be found criminally liable under RICO.

3. Challenge to the jury instruction

Parise Jr. next challenges -- as he did at trial-- the district court's jury instructions in which the district court advised the jury that "the Government has alleged that defendant Louis Parise Jr. was associated with the enterprise through his dealing[s] with various NMU officials you have heard testify."[6] Parise Jr. contends that this statement led the jury to believe that it couldfind proof of the requisite association by virtue of the alleged bribery of port agents Jones, Pegan, and Rywelski even if there was no other proof that Parise Jr. had associated with the NMU Enterprise. However, giving the term "dealings" its plain meaning, we interpret it to mean all interactions or contacts between the union officials and Parise Jr. during which they had the opportunity to learn about his role in the NMU Enterprise. There is no basis either in the context of the instruction or the evidence of the case to equate the

_____

6. This instruction will be reviewed to determine if, taken as a whole and in the light of the evidence, it fairly and adequately submitted the issue to the jury. See United States v. Traitz, 871 F.2d 368, 385 (3d Cir. 1989) (citation omitted). No error will be found if the district court correctly communicated the substance of the law to the jury so that the jury was not misled as to the relevant law or issues. Id.

word "dealings" with payoffs or bribes. The substance of the testimony of NMU employees such as Pegan and Rywelski was not limited to their discussion of payoffs for legal referrals, but also included testimony in which they described Parise Jr.'s overall involvement with the NMU Enterprise. Furthermore this jury instruction referred to "various NMU officials" who testified, including James Overstreet, a business agent for the NMU, and Kenneth Gerasimos, a former Vice President of the union. Both of these officials testified that Parise Jr. was present at union meetings and events. The entire testimony of the officials as to "dealings" with NMU officials formed the evidentiary basis for a jury determination that Parise Jr. was "associated with" the enterprise.

Finally, it is important that the challenged portion of the charge be read in the context of the entire set of instructions. The district court did instruct the jury as to the need for proof of Parise Jr.'s involvement with the enterprise and its affairs as such:

> [T]he Government must establish that each defendant was able to commit the racketeering offense solely by virtue of his position in the enterprise or his involvement in or participation in or control over the affairs of the enterprise. The Government must also establish beyond a reasonable doubt that the alleged racketeering acts were committed in the conduct of the affairs of the enterprise.

The court's instructions made clear that conduct relating to the NMU Enterprise must form the basis for RICO liability. Therefore, we find that the district court's instructions correctly conveyed the substance of the law and fairly and adequately submitted this issue to the jury.

B. Predicate Acts of Commercial Bribery

In order to prove a RICO violation, the government must demonstrate that the defendant participated in the operation of an enterprise "through a pattern of racketeering activity . . ." 18 U.S.C. S 1962(c).7 A pattern is
_____

7. "Racketeering activity" is defined, in pertinent part, as "any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery,

11

established by proving that the defendant committed two or more illegal acts of the type associated with organized crime. See Riccobene, 709 F.2d at 226-27. The indictment alleged that Parise Jr. had violated Pennsylvania's law against commercial bribery by paying port agents to refer personal injury cases to Sacks. The testimony elicited at trial established that port agents were favoring Sacks in exchange for payoffs from Parise Jr. The jury found that Parise Jr. had bribed two union employees, Pegan and Rywelski. Pennsylvania's statute defines commercial bribery as follows:

> An employee, agent or fiduciary commits a misdemeanor of the second degree when, without the consent of his employer or principal, he solicits, accepts, or agrees to accept any benefit from another person upon agreement or understanding that such benefit will influence his conduct in relation to the affairs of his employer or principal.

18 Pa. C.S.A. S 4108(a). Under the following provision, the statute also criminalizes solicitation of bribes:"[a] person commits a misdemeanor of the second degree if he confers, or offers or agrees to confer, any benefit the acceptance of which would be criminal under subsections (a) or (b) or this section." 18 Pa. C.S.A. S 4108(c). Thus, by conferring the benefit on the union port agents, Parise Jr. could be found guilty of commercial bribery.

Parise Jr. argues that giving money to a union agent or employee for the referral of personal injury cases does not constitute "conduct in relation to the affairs of" the union as required to establish commercial bribery under Pennsylvania law. Parise Jr. is essentially contending that because referring seamen to lawyers is not included among a port agent's official duties, it cannot constitute "conduct in relation to the affairs of" the employer. He asserts that the union -- the employer in this case -- has no interest or stake in which lawyer an injured worker chooses, and that

_____

extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical . . . which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. S 1961(1)(A).

providing legal referrals is not within the scope of the port agents' employment. The government argues that Parise Jr.'s reading of the statute, especially in light of the facts of this case, is too constricted. It urges that the "affairs in relation to" language of the statute encompasses employment-related activity beyond that which is part of an employee's official duties.

As the present case arises under this court's federal question jurisdiction, we will address all of the issues necessary to our ruling, including questions involving the interpretation of state law. See United States v. D'Amato, 436 F.2d 52, 54 (3d Cir. 1970). In interpreting the text of 18 Pa. C.S.A. S 4108, we are mindful that the Constitution requires that criminal laws be strictly construed. Due process mandates that criminal statutes give "fair warning . . . to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." McBoyle v. United States, 283 U.S. 25, 27 (1931); see also United States v. Lanier, 520 U.S. 259 (1997). In addition, Pennsylvania's laws regarding statutory construction dictate that penal provision are to be strictly interpreted. 1 Pa. C.S.A. S 1928(b)(1). However, the Pennsylvania courts have also held that "strict construction does not require that the words of a criminal statute be given their narrowest meaning or that the legislature's evident intent be disregarded." Commonwealth v. Gordon, 515 A.2d 558, 561 (Pa. 1986). Furthermore, we must also refrain from reading additional provisions into a statute when its meaning is clear. See In re J.S., 586 A.2d 909, 913 (Pa. 1991). Against this backdrop, we turn our attention to the meaning of the statute and the evidence offered to prove that the port agents' receipt of money influencing their conduct was "in relation to the affairs" of their employer, the union.

a. Requirements for Commercial Bribery under the
   Pennsylvania Statute

At the outset, it must be noted that the language of the Pennsylvania commercial bribery statute makes its reach quite broad. It requires that an employee solicit or accept a benefit from another in order to influence the employee's conduct in relation to his employer's affairs. The statute

13

contains no requirement that the affected conduct be in relation to the official duties of an agent or employee, nor does it require a showing that an offender's conduct was adverse to the interests of the employer. In construing the language of the commercial bribery statute and in determining the meaning of "conduct in relation to the affairs" of an employer, we turn to the case of Commonwealth v. Bellis, 399 A.2d 397 (Pa. 1979), for direction.

In Bellis -- the only Pennsylvania Supreme Court case which discusses this issue directly -- the court affirmed the judgment of sentence of a city councilman convicted of commercial bribery.8 Bellis, 399 A.2d at 400. Councilman Bellis had represented private parties before city agencies in order to help these companies secure contracts with these agencies. The companies rewarded his efforts accordingly. Among other contentions, Bellis argued to the court that he was not guilty of commercial bribery because the conduct at issue did not interfere with his official duties as a councilman. His conduct involved contracts between third parties and other city agencies and departments, quite apart from any matter before city council or otherwise affecting his role or responsibilities as a councilman. The Bellis court found that it was uncontested that the defendant's acceptance of these bribes "did not affect the performance of his official duties as a city councilman" and that "he did not take any action in City Council on behalf of private parties." Id. at 398. The court stated, however, that whether a particular activity was among an employee's "official duties" was "irrelevant" to the commercial bribery inquiry. Id. at 400. Thus, the Pennsylvania Supreme Court has rejected the argument that the bribe must impact one's official duties in order to comprise "conduct in relation to the affairs of his employer or principal."

The Bellis court recognized that commercial bribery was criminalized on the theoretical premise that such acts represent a violation of the duty of loyalty that an employee owes to an employer. The court stated that

_____

8. Bellis was convicted under 18 Pa. C.S.A. S 4667, the predecessor of 18 Pa. C.S.A. S 4108.

14

> [t]he purpose of Section 4667 is to require an"agent,
> employe or servant" to possess an undivided loyalty to
> his principal. It is impossible for an agent to retain this
> loyalty as long as he solicits and/or receives money
> from third parties in return for acting on their behalf
> (i.e., "showing . . . favor or disfavor") in his principal's
> affairs. By representing private parties before city
> officials while he was a councilman, appellant showed
> "favor or disfavor" in the affairs of his principal (the
> City of Philadelphia) in that he negotiated on behalf of
> and in the best interests of private parties in their
> dealings with the city. Hence, appellant violated
> Section 4667.

Bellis, 399 A.2d at 400. Thus, the court determined that a
violation of the employee's duty automatically occurs when
an agent or employee offers or receives money which causes
him to act in a certain way -- namely as the payor wishes
-- in the conduct of the affairs of his employer. The court
viewed the violation as being implicit in the conduct. The
act of accepting a benefit to show favor is the gravamen of
the crime.

The above-quoted language in Bellis makes it disloyal,
and criminal, for an employee to accept money to show
favor to third parties in his principal's affairs. We view this
reasoning as undermining the position taken by our
dissenting colleague that being influenced for money in
one's job is criminal only if found to be against the interests
of the employer. Neither the Pennsylvania legislature, nor
its courts, have inserted such a requirement into the
offense of commercial bribery. The Bellis court did not
examine the contracts in question to determine whether
they were good for the City. Nor do we believe that such an
inquiry is appropriate under the plain meaning of the
statute. The Bellis court made clear that the showing of
favor or disfavor on the basis of money paid is the harm
addressed by the commercial bribery statute. The court
need not make a determination as to whether the choice of
a particular vendor influenced by a monetary payment was
detrimental to the employer. In U.S. v. Johns, 742 F. Supp.
196, 220 (E.D. Pa. 1990), the court found the defendant
guilty of commercial bribery under S 4108 even though the

15

parties had stipulated that the price and quality of the products obtained from the favored vendor were "more favorable" than any offered by competitors. While it is true that other states have included this requirement as a statutory element or interpreted it to be a requirement, those cases are not our guide.9 Courts should not legislate by reading into the laws provisions not included by the legislature.10 This principle was recently reiterated by this

_____

9. At least one state includes the words "contrary to the interests of the employer" within its statute. See Utah Code Ann. S 76-6-508 (1953). Another requires that the "conduct of the employee cause[ ] economic loss to the employer." See Ariz. Rev. Stat. S 13-2605. Pennsylvania's statute contains no such limiting language. It is true that "[i]t appears that in New York, actions which might otherwise contravene Penal S 439 [commercial bribery statute] are not criminal if they do not affect the employer's interest in any way." D.E. Ytreberg, Annotation, Validity and Construction of Statutes Punishing Commercial Bribery, 1 A.L.R.3d 1350, 1361 (1965) (citing People v. Jacobs, 130 N.E.2d 636, 637 (N.Y. 1955) and People v. Graf, 24 N.Y.S.2d 683 (App. Div. 1941)). However, we believe that the dissent has misinterpreted this excerpt as stating a requirement which has been read into the statute by all states. As we discuss, we find the reasoning of these cases to be inconsistent with the Pennsylvania courts' interpretation of this state's commercial bribery statute. The dissent also cites Jackson v. Radcliffe, 795 F. Supp. 197, 206 (S.D. Tex. 1992) in support of the proposition that payments in exchange for referrals will only constitute commercial bribery where an employee has put the interests of the payor above the contrary interest of the employer. In that case, the court found that the kickbacks at issue simply did not constitute a bribe or benefit as required by the statute. Thus, the court never reached the issue of whether the employer was adversely impacted by the scheme.

10. The dissent cites State v. Nadeau, 105 A.2d 194 (R.I. 1954) for the proposition that it is not commercial bribery to induce an agent to accept a payment in an attempt to influence conduct over which the agent had no control. We note first that Nadeau had been convicted under Rhode Island's statute prohibiting bribery of a public official, not under that state's commercial bribery statute. Nadeau is thus inapposite because its language regarding "official acts" seems clearly limited to the context in which that appeal was brought, namely, a government official accused of taking bribes in connection with his duties as an official. Further, to the extent that the holding of Nadeau can be applied to commercial bribery, we do not find it to be consistent with Pennsylvania precedent. The court in Bellis did not concern itself with whether Councilman Bellis could actually control or influence the contracting practices of the various city agencies involved. Again, the imposition of elements not present in the statute is not warranted.

court in Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 527-28 (3d Cir. 1998). There, interpreting a different section of Pennsylvania's commercial bribery statute, we rejected an attempt by one of the parties to insert an additional element -- that of the defendant's motivation -- into the statute. Id. We noted that the crime of commercial bribery is "carefully circumscribed," consistent with our view that elements which do not appear in the statutory language should not be read into the law.11

In order to find the payment of money influenced the employee's conduct in relation to the employer's affairs, we must define the scope of the union's affairs. In so doing, we will consider not only the mission and activities of the union but whether the conduct in question was consistent with the scope of the union agents' employment. Thus, in this case, we must determine if the port agents were performing their jobs in advising the seamen as to counsel for work-related injuries and whether this practice of referral was a concern of the union and part of its affairs. Appellants do not seek to define "affairs" but contend that whatever it means, the referral to counsel was not part of the affairs of the union. We believe the evidence supports the opposite conclusion.

b. The Union's Affairs

The purpose of the NMU, as set forth in its constitution, is described as helping "needy, sick and distressed"

_____

11. Having determined that the government was not obligated to prove as a separate element of the commercial bribery offense that the agent was acting against the interest of the employer, we need not reach the issue raised by the dissent that the conduct in question was not contrary to the interest of the employer because the employer in this case condoned the corrupt activity. However, we question the assumption inherent in that argument that the corrupt management of the union should be equated with the union entity itself for the purposes of determining what was "contrary to its interest." Simply because Parise Sr. and some other corrupt union leaders knew that some port agents were bribed does not mean that the practice could not have been against the interest of the port agents' employer, the union. The union has an existence separate from its leadership -- its mission is to represent and assist union members.

17

members. One union official described the role of the union in the following terms:

> [T]he NMU has a very proud history. And I think we're important to our members. Certainly we represent them before the companies. We are responsible for their collective bargaining agreement overall, but we also represent them on a day to day basis. If a seaman has a problem aboard a ship, he will come to the hall and talk to a union official.

J.A. at 1308. Other testimony supported this description of the union as concerned with the work-related welfare of union members. We can easily take judicial notice of the fact that the union movement exists of, by, and for workers and dedicates itself to their welfare and the recognition of their rights. Seeking redress for work-related injury through proper legal representation easily fits within this sphere of the union's interest and affairs. In addition to the fact that making attorney referrals was consistent with the purposes of the union, there was significant evidence presented from which the jury could have determined that the union concerned itself with its members' legal representation and that making attorney referrals was part of the union's affairs.

The testimony demonstrated that the job of port agent involved a wide range of tasks encompassing as many different aspects as there are facets of the union members' work-related needs. J.A. at 1309. One agent explained that in addition to taking care of finances he enforced ship rules, took care of grievances and supervised the operation of the union hall. J.A. at 594. Another stated that as the business agent of the port he would "[t]ake care of all the union business, ship people out, take care of my members." J.A. at 637. While in some types of work, helping others mights be viewed as incidental to a job function, we view the union – port agent – member relationship depicted here to provide a unique setting in which assistance of this nature was integral to, not incidental to, the union's business of caring for its members. In describing her job as a Pension and Welfare Plan Representative, Rywelski said that she assisted union members and stated of this population, "the average seaman is not well educated and

18

they need -- a lot of them can barely read and they need help preparing these forms. A lot of them, they don't understand them and they just need assistance." J.A. at 521-22.

Thus, the union through its port agents and other employees, served as counselors and helpers of this itinerant, seafaring population. Consistent with this role, making attorney referrals was a service routinely provided to the seamen coming into port by port agents and other union employees. Union members testified that they relied on port agents for attorney referrals after suffering an on-the-job injury. J.A. at 507; 1201. It was well-known among union members that port agents provided such referrals. Significantly, there was no evidence presented that union members, officials, or employees believed that making attorney referrals was inappropriate or beyond the scope of the port agents' employment or the union's sphere of interest. The evidence is clear that these employees provided attorney referrals to injured members and that this practice was consistent with the mission of the NMU. This practice furthered the union's express goal of assisting sick or needy members.

Further, not all union employees received payoffs for making these referrals. Gerasimos, a union official, testified that assisting members with legal representation was "an unofficial duty" of port agents and that as a port agent he had provided such referrals without receiving any payments. J.A. at 737-38. Another official, a Vice President of the NMU, testified that she had never taken any money for making attorney referrals. J.A. at 1311.[12]

Additionally, in determining that providing attorney referrals was conduct "in relation to the affairs" of the union, we cannot ignore the NMU's involvement in the business of legal services and referrals. Parise Sr. circulated a letter in which he named individual lawyers as the official

_____

12. This Vice President testified that while she knew port agents made referrals to personal injury lawyers, she was unaware that some received payments or fees in exchange for making these referrals. J.A. at 1310. This contradicts the dissent's view that "the entire Union leadership knew of cash payments." Dissent at 28.

19

"union attorneys" for particular geographic regions. Sacks was named as the official attorney for the East Coast and was given office space in the union hall in New Orleans. In addition, members of the NMU Enterprise, including Parise Sr. and Jr., established the Legal Services Plan for the purpose of providing routine legal services to union members -- hoping that participating attorneys would eventually be retained for lucrative personal injury cases. Thus, in the present case, Parise Sr. and others in the NMU Enterprise went out of their way to make the legal concerns of union members part of the NMU's "affairs."13

We believe that the facts of this case clearly bring the agents' conduct within the ambit of their jobs for the union and that the referrals of seamen to counsel was part and parcel of the affairs of the union. Union employees were able to be bribed by virtue of their employment with the union; that is, they held positions in which they were expected to counsel and advise union members. The injuries for which members required legal representation were sustained on-the-job. That attorney referrals were given for employment-related injuries further strengthens the relationship between the role of the union and these services. This practice is easily within the explicit mission of the NMU. Having examined the language of the statute and the facts of this case, we conclude that providing attorney referrals constituted conduct in relation to the affairs of the union.

While not specifically challenged by the appellant, we also note that the other requisite under the commercial bribery

_____

13. We recognize that the involvement of the NMU in the "legal affairs" of the union members was undertaken by Parise Sr. -- at least in part -- for his own financial gain. Thus, Parise Sr.'s efforts in this regard are not
dispositive of the fact that attorney referrals and legal services were part
of the union's affairs. However, this involvement must be viewed in the context of the evidence that providing attorney referrals was a common practice of the port agents. In addition, there was no testimony offered that any union members or officials questioned the use of union space for this purpose or establishment of the LSP to aid the seamen in their legal affairs. Providing these services was considered to be a legitimate activity of the union which furthered its mission of helping needy members.

statute, that is, that the employee be influenced to act in a particular way in relation to the employer's affairs is also shown by the evidence. The payments in this case clearly influenced the conduct of the port agents. These agents testified that their referrals were not based on a determination that Sacks was the best lawyer to represent injured union members. J.A. at 599; 640. Rywelski stated that she knew nothing about Sacks's skills as a lawyer or the fees he charged. J.A. at 528. In fact, when asked whether he was chosen to be the "NMU attorney" because he was a good lawyer, Sacks himself replied, "No, I got picked because I could pay off the agents. I had the money to do it." J.A. at 255. Both Pegan and Rywelski testified that they understood that they were receiving money to make referrals to Sacks -- they received a benefit to influence their conduct in relation to the union's affairs.

The dissent urges that our view of the relationship of lawyer referrals to the unions' affairs is misguided and attempts to analogize this situation to a hospital's lack of interest in a doctor's referral of a patient.14 We are also chastised for going beyond the classic example of conflict of interest depicted in Bellis. It is our ruling, however, that the evidence at trial provided ample support for the jury's finding that, given the unique relationship among the union, its members, and the port agents, the commercial Pennsylvania bribery statute had been violated.

The evidence and the case law support the conclusion that the union employees' conduct in these matters constituted the acceptance of money to affect conduct in relation to the affairs of the employer. Given the union's mission, the nature of the port agents' work, and the subject matter and nature of the referrals, the jury could reasonably find, as it did, that the agents' conduct violated Pennsylvania's commercial bribery statute and that Parise Jr., as solicitor, was guilty of this underlying offense for the purposes of the RICO conviction.

_____

14. In order for this analogy to be apposite, the hospital would have to be made up of, and exist solely by reason of, the patients as its members, and the doctor's sole responsibility, as charged by the hospital, would be to further the hospital's mission and assist the members/patients and provide for their needs. This is not the case.

21

C. Exclusion of evidence

Finally, Parise Jr. contends that the district court improperly excluded relevant testimony of a government witness on cross examination as to the non-criminal intent of the recipient of the alleged commercial bribe. The district court's exclusion of evidence is reviewed for abuse of discretion. See Abrams v. Lightolier Inc., 50 F.3d 1204, 1213 (3d Cir. 1995).

Pennsylvania's commercial bribery statute requires the establishment of an agreement or understanding between both parties that the benefit offered will influence conduct in relation to the affairs of the employer. 18 Pa. C.S. S 4108(c). Parise Jr. argues that the district court erred in excluding testimony which related to whether Rywelski thought she was "doing something wrong" or "committing a crime" when she took money from Parise Jr. The district court excluded the evidence because her state of mind regarding the criminal nature of the conduct was irrelevant. We agree. Parise Jr. confuses the need to show that there was an "agreement or understanding" with evidence of the intent or state-of-mind of the parties. The statute does not require that the parties knew that their agreement was wrong or illegal. The government did elicit relevant testimony from both Pegan and Rywelski that they understood that the payments they received from Parise Jr. were for referrals to lawyers. Thus, the district court did not exclude evidence which related to Rywelski's belief about whether an agreement or understanding had been formed. It excluded only that which was irrelevant -- evidence as to whether Rywelski had a criminal state of mind. Therefore, the district court's exclusion of that portion of Rywelski's testimony was not an abuse of discretion.

III.

Having considered all of the issues raised by Parise Jr. in this appeal, we find them to be without merit. Therefore, the judgment of the district court and its order denying the defendant's post-trial motion will be affirmed.

22

GARTH, Circuit Judge, dissenting:

Louis Parise, Jr. has been convicted and sentenced to serve thirty months in federal prison for racketeering. The jury convicted Parise of engaging in a pattern of racketeering acts by making cash payments to union officials John Pegan and Deborah Rywelski in exchange for referring injured union members to an attorney associated with Parise. The difficult question raised in this appeal is whether Parise's conduct qualifies as a "racketeering activity," which turns on whether his conduct constituted a violation of Pennsylvania's commercial bribery statute, 18 Pa. C.S.A. S 4108. See 18 U.S.C. S 1962(c); Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 521 (3d Cir. 1998). If Parise's conduct did not violateS 4108, then his RICO conviction cannot stand.

The government's theory is that Parise's referral payments violated S 4108 because Pegan and Rywelski acted "in relation to the affairs" of the union when they referred union members to Parise and Bernard Sacks, Esq. in exchange for payments from Parise. The majority has agreed with this theory, and has affirmed Parise's conviction and sentence.

I disagree with the majority's conclusion that Parise's conduct violated S 4108. I believe that the majority's broad interpretation of the "in relation to the affairs" language of S 4108 represents an unwarranted expansion of its scope contrary to its "carefully circumscribed" meaning, Brokerage Concepts, 140 F.3d at 528, and that the record reveals no evidence that Parise violated S 4108 when the statute is properly construed. Accordingly, I respectfully dissent.

I.

Pennsylvania is one of twenty states that criminalizes commercial bribery for influencing an agent's conduct "in relation to the affairs" of the agent's principal.1

_____

1. States that presently criminalize commercial bribery for influencing an agent's conduct "in relation to the affairs" of the agent's principal include

23

Pennsylvania's commercial bribery statute is representative of these statutes. Its text reads:

> (a) Corrupt employee, agent or fiduciary .––An employee, agent or fiduciary commits a misdemeanor of the second degree when, without the consent of his employer or principal, he solicits, accepts, or agrees to accept any benefit from another person upon agreement or understanding that such benefit will influence his conduct in relation to the affairs of his employer or principal.
>
> ....
>
> (c) Solicitation.–– A person commits a m isdemeanor of the second degree if he confers, or offers or agrees to confer, any benefit the acceptance of which would be criminal under [subsection (a)] of this section.

18 Pa. C.S.A. S 4108. Courts interpreting the "in relation to the affairs" language in the century since commercial bribery statutes were first enacted have held universally that the core of the offense is the breach of an agent's duty of loyalty. See, e.g., Note, Bribery in Commercial Relationships, 45 Harv. L. Rev. 1248, 1249 n.10 (1932) ("The breach of fiduciary duty has been considered the foundation of the offense [of commercial bribery.]"). Pennsylvania is no exception: in Commonwealth v. Bellis, 399 A.2d 397 (Pa. 1979), the Pennsylvania Supreme Court

_____

Alabama, see Ala. Code S 13A–11–120 (1975); Arizona, see Ariz. Rev. Stat. S 13–2605; Connecticut, see Conn. Gen. Stat. S 53a–160; Illinois, see 720 Ill. Comp. Stat. 5/29A–1; Louisiana, see La. Rev. Stat. Ann. S 14:73; Michigan, see Mich. Comp. Laws Ann. S 750.125; Minnesota, see Minn. Stat. Ann. S 609.86; Mississippi, see Miss. Code Ann. S 97–9–10 (1972); Nevada, see Nev. Rev. Stat. S 207.295; New Hampshire, see N.H. Rev. Stat. Ann. S 638:7; New York, see N.Y. Penal Law S 180.00 (McKinney); North Dakota, see N.D. Cent. Code, S 12.1–12–08; Oklahoma, see Okla. Stat. tit. 21, S 380; Pennsylvania, see 18 Pa. Cons. Stat. Ann. S 4108; Rhode Island, see R.I. Gen. Laws S 11–7–4 (1956); South Carolina, see S.C. Code Ann. S 16–17–540 (Law. Co-op. 1976); South Dakota, see S.D. Codified Laws S 22–43–1; Texas, see Tex. Penal Code S 32.43; Utah, see Utah Code Ann.S 76–6–508 (1953); Wisconsin, see Wis. Stat. Ann. S 134.05.

stated that "the purpose of [Pennsylvania's commercial bribery statute] is to require an agent, employe[e,] or servant to possess an undivided duty of loyalty to his principal." Id. at 400 (internal quotations omitted). This is consistent with the Pennsylvania legislature's Official Comment associated with S 4108, which states that the statute's purpose is to criminalize bribery in "relationships where a duty of fidelity is owed." This duty of loyalty is breached only when an employee acts contrary to the interest of his employer.

The precise scope of conduct criminalized by the "in relation to the affairs" language in state commercial bribery statutes identical to Pennsylvania's has been the subject of a substantial body of case law. These cases have established a consistent and certain meaning for the text we must interpret.2 According to these cases, the duty of loyalty protected by the statute is not violated unless the agent (here, Pegan or Rywelski) accepts a payment in exchange for conduct that puts the interests of the payor (here, Parise and Sacks) above the contrary interests of the principal (here, NMU, the union). See, e.g., D.E. Ytreberg, Annotation, Validity and Construction of Statutes Punishing Commercial Bribery, 1 A.L.R.3d 1350, 1361 (1965) (noting that in the cases interpreting the "in relation to the affairs" language, actions that did "not affect the employer's interest in any way" were not criminal); 11 C.J.S. Bribery S 3 (1995) (noting that commercial bribery statutes "require the offer of a bribe to an employee with the intent that he promote the interests of the person offering the bribe over those of his employer").

Accordingly, it is not commercial bribery to induce an agent to accept payment for conduct that does not adversely affect the interests of the agent's principal. See People v. Jacobs, 130 N.E.2d 636, 637 (N.Y. 1955)

_____

2. Although most of the cases have arisen outside of Pennsylvania, the fact that they have established a certain meaning for the text in question makes these cases a natural source of interpretive authority. See Simmler v. City of Philadelphia, 198 A. 1, 3 (Pa. 1938) (looking to the interpretations of the same language in statutes by other state courts in order to interpret a vague Pennsylvania statute).

(overturning conviction of photographer who paid bursar for list of names of ocean liner passengers, because there was no evidence that release of the names of the passengers was contrary to the interests of the ocean liner company). Further, it is not commercial bribery to induce an agent to accept payment in an attempt to influence conduct over which the agent has no control. See State v. Nadeau, 105 A.2d 194 (R.I. 1954) (overturning commercial bribery conviction of councilman for planning to accept payment to attempt to influence selection of city police chief, because councilman had no control over selection process).

An illustrative example of these principles is People v. Graf, 24 N.Y.S.2d 683 (App. Div. 1941). In Graf, a New York appellate court reversed the conviction of a union official who had accepted expense payments from management. Management had wanted to expand the territorial scope of its sign making business beyond New York, and sought to have Graf travel to union headquarters outside of New York to encourage the union members outside of New York to allow the sign company to accept work there. When the union refused to pay Graf's travel expenses, management made a secret arrangement with Graf to do so. Graf was subsequently indicted and convicted of commercial bribery. The basis of the charge was that Graf had accepted payments from management that had induced him to act "in relation to the affairs" of his union.

On appeal, Graf argued that his conduct was not "in relation to the affairs" of the union. The Appellate Division agreed, noting inter alia that Graf had done nothing that could be construed as putting the interests of the sign company over those of his union. Even though Graf had secretly accepted payments to do union-related activity, "the action taken by [Graf] was favorable to the union." Id. at 687. This was insufficient to constitute commercial bribery, the court held, because the statute "requires proof of payment of money to influence an agent in a way inconsistent with his duties towards his employer." Id. (emphasis added).

As these cases indicate and our court recently recognized, the scope of Pennsylvania's commercial bribery statute is "carefully circumscribed." Brokerage Concepts,

26

140 F.3d at 528. Of course, this does not mean that it is impossible for payments made in exchange for an agent's referral to a third party to constitute commercial bribery. See, e.g., Hastings v. Fidelity Mortgage Decisions Corp., 984 F. Supp. 600, 606-07 (N.D.Ill. 1997) (Civil RICO) (denying motion to dismiss for failure to state a claim under Illinois commercial bribery statute for referral payment scheme, but noting that plaintiffs had survived 12(b)(6) dismissal only "barely," and noting that "[i]f this set of facts were presented to us at the summary judgment stage, we would be inclined to grant judgment for the defendants"); cf. Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., No. 95-1698, 1995 WL 455969 (E.D.Pa. July 27, 1995) (Civil RICO) (denying motion to dismiss for failure to state a claim of corruption of a disinterested person under 18 Pa. St. Ann. S 4108(b) in a referral scheme involving health care company). However, it does mean that making payments in exchange for agents' referrals constitutes commercial bribery only when the agent has put the interests of the payor above the contrary interests of the agent's principal. See Jackson v. Radcliffe, 795 F. Supp. 197, 206 (S.D.Tex. 1992) (Civil RICO) (holding that hospital that referred clients to a radiologist in exchange for 30% of the radiologist's fees did not violate commercial bribery statute by breaching duty of loyalty to patients).

II.

An application of these legal principles to Parise's payments to Pegan and Rywelski leads ineluctably to the conclusion that these payments did not constitute commercial bribery. The record simply fails to support the view that Pegan and Rywelski acted in any way contrary to the interests of the union when they referred injured union members to Parise and Sacks. There is no evidence that Pegan and Rywelski put Parise's and Sack's interests over the union's because the union was completely disinterested in which lawyer an injured seaman retained for a personal lawsuit.

Under the statute, an employee may not take a bribe if it will "influence his conduct in relation to the affairs of his employer or principal." 18 Pa. C.S.A. S 4108(a) (emphasis

27

added). Although an individual seaman obviously has an interest in which lawyer represents him, an individual seaman is not the employer or principal of the port agents; the union as a collective whole is the port agent's employer or principal. Thus, whether or not a seaman knew that the port agents were receiving referral fees, the port agents did not, under this Pennsylvania statute, owe an individual seaman a duty of loyalty.

I begin with the union's position on its port agents accepting referral payments. The record reveals that the entire union leadership knew of the cash payments, and even encouraged them. Referral payments were considered rewards for loyal port agents, whose official duties focused on the much more mundane tasks of accounting and producing weekly financial reports for higher union officials. App. 743. As the Government concedes in its brief, "the [union] historically allowed its officials (usually port agents) to refer injured members to designated maritime lawyers in exchange for cash payoffs. Indeed, Parise, Sr. admitted that as union president he sometimes fielded member requests for legal referrals, and that he expressly allowed port agents to refer members to personal injury attorneys." Appellee's Br. at 8 (emphasis added and citations omitted). In other words, the payments were part of the union's standard procedure, endorsed by the union president himself.

In light of the union's express allowance (if not encouragement) of referral payments, it is unclear how port agents could have been acting contrary to the union's interests in receiving them. See Jacobs, 130 N.E.2d at 637 (holding that an employee could not be guilty of violating commercial bribery statute because employer knew of payment and declined to stop it; employer's allowance reflected fact that payment could not have been contrary to employer's interest).

Further, although the union had no interest in union members' selection of a personal injury lawyer, the testimony of Pegan and Rywelski reveal that they were not acting contrary to the best interests of the union when they referred seamen to Parise Jr. and Sacks.3  John Pegan, the

_____

3. Pegan and Rywelski testified under immunity agreements, as did Sacks.

28

port agent for Boston, first became acquainted with Sacks when Pegan became unsatisfied with the lawyer he had hired three years earlier to represent him in a personal injury action. App. 663. Acting on the advice of Louis Parise, Sr., Pegan consulted with Sacks, who advised Pegan that "it wouldn't be feasible" to switch lawyers at that time "because of all the investigation work" that Pegan's lawyer had already performed. App. 665. Pegan believed that Sacks was a good lawyer: Pegan testified that he "had heard" that Sacks "got good results in the injury cases." App. 667. Thus, when the union members in Boston were "not satisfied with [Boston maritime lawyers] . . . [and] want[ed] somebody else," App. 667, Pegan would refer the members to Parise, Jr. and Sacks.

Similarly, there is no evidence that Deborah Rywelski, who acted as the port agent in Charleston, South Carolina, was acting contrary to the union's interest when she made attorney referrals. When a member would come to her and ask her for a lawyer, she testified, she would give the member Parise, Jr.'s card. Rywelski would then explain that Parise, Jr. was an investigator for Sacks, and that Parise, Jr.'s father was the head of the union. App. 530. She would tell the union member, "Call him up. If you like what they've got to say, fine. [I]f you don't, I know some other attorneys I can send you to." Id. (emphasis added). As in State v. Nadeau, supra, the port agents had no control over which lawyer an individual seaman would eventually choose; they could not themselves commit the union members to Sacks's representation.

The union's express allowance of the payments, combined with the testimony of Rywelski and Pegan, reveals that there is no evidence that Pegan and Rywelski placed the interests of Sacks and Parise, Jr. ahead of the interest of the union in accepting payments from Parise, Jr. Pegan thought that Sacks was a good lawyer, and even sought Sacks's representation for himself. Rywelski was very careful to explain that Sacks was only one of several attorneys to whom she could refer the member, and directed the member to accept Sacks's representation only if the member "liked what [Parise, Jr. and Sacks had] to say." The union leadership not only knew of the referral

29

payments, but encouraged and even directed them. Given these facts, there is simply no evidence that the union had an interest in which lawyer a member retained and no evidence that Rywelski or Pegan acted against the interests of the union in referring injured union members to Parise, Jr. and Sacks. Accordingly, Parise, Jr.'s payments to Rywelski and Pegan for making the referrals could not constitute commercial bribery.

III.

The majority's understanding of S 4108 is dramatically different from the one I have presented. As I see it, the majority's approach has five significant flaws.

1. Failure to follow the accepted interpretation of commercial bribery.

In the absence of definitive authority in Pennsylvania,4

_____

4. The few cases in Pennsylvania that interpretS 4108 do not address the issue at hand. United States v. Johns, 742 F. Supp. 196 (E.D. Pa. 1990), aff'd, 972 F.2d 1333 (3d Cir. 1991) (table), is inapplicable because
it involved the quintessential example of commercial bribery. In Johns, an employee, responsible for purchasing supplies and services for his employer, chose vendors for his employer in exchange for kickbacks from the vendors. The employer certainly had an interest in which vendors provided the employer goods and services. In this case, the port agents gave seamen (who were not the port agents' employers or principals) advice on who to choose as a personal injury lawyer. The port agents themselves had no control over who the seamen would choose as a lawyer, and the port agents' employer, the union, had no control or interest over the seamen's choice of a lawyer.

Likewise, Pennsylvania v. Bellis, 484 Pa. 486, 399 A.2d 397 (1979), involved a city councilman's representation of third parties in their contractual dealings with the city and its agencies. The contracts at issue in Bellis were between the third party entities who paid the councilman a fee and the councilman's employer, the city. Thus, the councilman was taking money to help third parties gain advantages with his employer. In this case, the port agents did not receive referral fees from Sacks so that Sacks could represent the port agents' employer, the union, in its affairs. Rather, individual union members chose Sacks to be their personal lawyers to assist them in pursuing their personal, not union, claims.

30

the majority's refusal to acknowledge a century of law from other jurisdictions interpreting the same or similar commercial bribery statutes is perplexing. As I have previously pointed out, some twenty states have commercial bribery statutes that contain S 4108's exact phrase. See note 1, supra. Most of the relevant cases (especially Graf, Jacobs, Nadeau, and Radcliffe) advance an interpretation of the commercial bribery statute that is very different from that offered in the majority's opinion, and that would lead to a contrary result. The majority opinion seeks to distinguish only Nadeau, see Maj. Op. at 16 n.10, and declines to discuss the other statutes I have cited and the other cases. Id. Hence, it neither reconciles those cases with its approach, nor explains why they were wrongly decided, if in fact it believes they were.

2. Failure to identify any breach of loyalty owed to the union as the employer of the port agents.

My second objection is the majority's focus on union members, who are not the port agents' employers, as distinct from the union itself, which is the port agents' employer. It should be remembered that the commercial bribery statute requires and Bellis emphasizes that an agent must possess an undivided loyalty to his principal, that is, his employer. The record reveals that none of the actions taken by the port agents in any way affected adversely or were disloyal to the union. Indeed, one would be hard pressed to argue that the port agent's referral activities were adverse to the union members, but of course, that is irrelevant. As I have stated repeatedly, the port agent must have been disloyal to the union to meet the statutory standard and be held criminally liable.

One can search far and wide in the majority opinion and in the record but still cannot ascertain disloyalty or adverse actions taken by Pegan and Rywelski with respect to the affairs of the union. Hence, the holding of Bellis, as distinct from the standard applied in Bellis, is inapposite to Parise's appeal. Bellis, which is cited by the majority at 14-15, is a classic example of conflict of interest, falling within the purview of S 4108's reach. In Bellis, a city councilman accepted payment from third parties to negotiate on their behalf with the councilman's employer or principal. This

31

action adversely affected the City of Philadelphia's interest and affairs. It would have been impossible for Bellis to negotiate on behalf of his third party clients and against the City of Philadelphia without breaching his duty of loyalty to the City.

But Parise is not Bellis because Parise's payments to Pegan and Rywelski did not involve the union, and it is the union which is the employer of the two port agents. An example furnished to me by one of my colleagues highlights this distinction. He posited:

> Suppose an individual visits a hospital to receive an inoculation required for foreign travel. After receiving his shot, the patient asks the doctor if she knows where the patient could get his vision checked before departing. If the doctor refers the patient to an optometrist from whom she had received payments in exchange for referrals, is the doctor guilty of commercial bribery (and, by extension, a RICO violation)? Even assuming that making referrals is part of the hospital's affairs, the doctor has not committed commercial bribery because she has not acted contrary to the interest of her employer, the hospital.

Even if the referral is contrary to the patient's interest (as a referral to an allegedly poor attorney may be contrary to a union member's interest), the overarching principle upon which Bellis is predicated requires an agent's "undivided loyalty to his employer." Thus, extending the bribery statute to cover payments for "employment-related activity" leaves it without limit and far exceeds the text of the statute and the import of Bellis.

3. Invading the function of the legislature.

My third objection is that the majority's interpretive approach seems to me inconsistent with a proper judicial role. As the Supreme Court stated in United States v. Bass, 404 U.S. 336, 92 S. Ct. 515 (1971), "legislatures and not courts should define criminal activity." Id. at 348, 92 S. Ct. at 523. Courts must be careful not to expand the reach of criminal statutes by judicial fiat because citizens should not be sent to "languish[ ] in prison unless the [legislature] has said they should." Id. (quoting Henry Friendly, Mr.

32

Justice Frankfurter and the Reading of Statutes, in
Benchmarks, 196, 207 (1967)); see also Yates v. United
States, 354 U.S. 298, 310, 77 S. Ct. 1064, 1072 (1957)
(Harlan, J.) (absent legislative guidance, criminal statutes
are to be strictly construed).

The majority recognizes these principles, see Maj. Op. at
12-13, but has not honored them. It has chosen simply to
reject the long-established meaning of the "in relation to the
affairs" language, and has substituted its own, much
broader interpretation. As the majority acknowledges, a few
months ago our Chief Judge stated in a civil RICO case that
commercial bribery in Pennsylvania is "a carefully
circumscribed crime," Brokerage Concepts, 140 F.3d. at 528
(Becker, C.J.), and refused to expand the reach ofS 4108 to
include conduct that would not otherwise be criminal
under the statute. The majority turns the Brokerage
Concepts holding on its head--the case stands for the
proposition that the reach of the criminal bribery statute
should not be expanded, yet the majority cites the case for
the proposition that the criminal bribery statute should not
be limited in accordance with established principles of
criminal statutory interpretation. The Brokerage Concepts
case requires that the courts not expand S 4108 beyond its
current parameters; I submit that a broadening of the
scope of conduct criminalized by S 4108 is best left to the
Pennsylvania legislature.

4. Majority's misapplication of its broad reading of
   S 4108 to this case.

My fourth objection relates to the majority's application of
its newly fashioned standard to the facts of this case. The
majority reasons that port agents regularly referred injured
union members to lawyers, such that paying port agents for
those referrals influenced their work-related conduct. Maj.
Op. at 19-21. However, the record is clear that the port
agents almost always received payments in exchange for
their attorney referrals. According to Sacks' testimony,
payments were the standard practice in the union: the
question was not whether the port agents would be paid for
their referrals, but who would pay. App. 160-66. Even the
Government's brief concedes this, stating that the union
"historically allowed its officials (usually port agents) to

33

refer injured members to designated maritime lawyers in exchange for cash payoffs." Appellee's Br. at 8.

Absent evidence that port agents regularly referred injured union members to lawyers when they were not being paid off to do so, and more importantly, absent any record evidence of adverse effects on the union, 5 I do not understand how the majority can conclude that making attorney referrals was part of the union's affairs. Surely, if it was part of the union "affairs" to refer seamen to lawyers, then there would be substantial evidence of port agents referring union members to lawyers when no payments were involved. The record only supports the view that port agents regularly engaged in activities of no concern to their employer and beyond the scope of their employment (which was focused on accounting and financial reporting). They simply took advantage of their acquaintances with the injured seamen and enhanced their income by making attorney referrals.

5. Overextended reading of the port agents' scope of employment.

My fifth and final objection has to do with the actual and not the hypothetical functions of the port agent. The record discloses that their established duties embraced primarily accounting and financial reporting. App. 743.6 Any referrals

---

5. The majority refers to Mr. Gerasimos as having provided legal referrals without receiving any payments. Maj. Op. at 19. Gerasimos, however, characterized this function as an unofficial duty, not an official duty, of a port agent. App. 737. The other reference by the majority to a vice-president who did not take money for attorney referrals obviously was not a port agent.

6. The union's constitution and by-laws specifically describe the duties of a port agent. Kenneth Gerasimos, a union vice-president and former port agent of NMU, agreed that the constitution and by-laws accurately reflected the duties of a port agent, which provides:

> Branch [port] agent shall be responsible for implementing the
> directives of the division chairman and council in the port or ports
> of their jurisdiction. They shall be prepared to account financially or
> otherwise for the activities of their port or ports whenever demanded
> by the division chairman. In any event, they shall prepare and

forward to the district treasurer a weekly financial report showing in

34

made, whether to doctors, lawyers, therapists, accountants, barbers, or the like, were undertakings beyond the scope of their employment. The fact that they were paid for these activities could be of no moment to the union, their employer, and indeed could not be deemed evidence of disloyalty to the union. On the other hand, had the port agents falsified their financial reporting and accounting or disclosed to a third party confidential union information in return for a payment by a third party, that falsification or disclosure would have been evidence of disloyalty to the union and would have constituted commercial bribery because it affected the affairs of the union, their employer.

The port agents could not have been fired or sanctioned, and indeed they were not, for taking monies for referrals, but common sense dictates that had they affected their employer's interest by falsifying or in any way not truthfully performing their accounting and financial reporting functions in exchange for third party monies, their jobs would be at risk, to say nothing of criminal liability being visited upon them.

IV.

Given Louis Parise, Jr.'s intimate involvement in his father's schemes over a period of years, he may have violated several criminal statutes. However, the United States prosecuted Parise, Jr. on a RICO charge based only on a tenuous reading of a rarely used state criminal statute. In the course of affirming Parise, Jr.'s conviction, the majority has extended the statute just enough to include his conduct within its grasp. A fair and consistent interpretation of the statute, however, reveals that Parise, Jr. has been convicted and sentenced to serve thirty

_____

> detail weekly income and expenses and complying with all other accounting directions issued by the district treasurer.

The majority relies upon the preamble of the NMU constitution, rather than this provision specific to port agents, to define the scope of the port
agents' employment. The preamble describes the union's purpose with respect to its members, while the provision above cited describes the port agents' duties with respect to the union.

months in prison for conduct that did not constitute the crime of commercial bribery.

Accordingly, I respectfully dissent.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

36